JoNes, Judge,
delivered the opinion of the court:
On October 12,1931, plaintiff contracted with the defendant to construct certain levees on the lower Mississippi River containing approximately 2,950,000 cubic yards of earth. The particular project was known as Item R 831, Chamberlain-Lobdell Levee, Lots A, B, C, and D. The consideration was to be 12.40 cents per cubic yard. The work was to begin on each of the four lots within 20 calendar days after receipt of notice to proceed. Completion was to be within 450 calendar days from the date of such notice. ■>
According to the contract and specifications the material for building such levees was to be obtained from an old levee and borrow pits located on the right-of-way. The type of material to be selected from these sources was set out in the specifications.
On October 30, 1931, plaintiff received notice to proceed, and the date for completion was therefore fixed as not later than January 22, 1933.
Plaintiff was hopelessly inexperienced in the building of levees. Most of his construction experience had been in the city of Chicago and ho had never done any levee construction work.
A machinery salesman by the name of Maxson talked with Mr. Ranieri and went down to visit the area where the levee was to be constructed. He was accompanied by a Mr. Dee, who was a representative of the plaintiff, and also by a Mr. Derock. Maxson made some estimates and plans of operation, and together with Derock furnished Dee some figures. [Jpon these figures Dee made some calculations. All three looked over the site. The plaintiff used this information, plan of operations, and the calculations in making his bid. Maxson then sold him such new and second-hand machinery as was thought to be necessary in order for plaintiff to do the essential construction work.
*504 Plaintiff’s unfamiliarity with both this section of the country and the character of work he had contracted to do soon became evident. While he commenced within a week with some preparatory work such as clearing, grubbing, and plowing which required about two weeks’ time, he :did not begin placing the material in the levee on Lot A until about 103 days after receipt of notice to proceed; on Lot B, 228 days after such receipt; on Lot D, 298 days after receipt of notice, and on Lot C, 336 days after such receipt.
Plaintiff ran into many difficulties in handling the soil from the borrow pits, encountering cypress stumps and other organic matter, which caused damage to his machinery. He also had difficulty with sloughs and slides. There was also much rainfall. These conditions, however, were not shown to be unusual in that section.
Many times during the course of the work the Government inspectors served notices upon plaintiff warning him of departures he was making from contract requirements. Such notices were given in 231 instances, as set out in Finding 5.
On December 12,1932, plaintiff ceased work on the project, complaining that subsurface and latent conditions differed materially from the conditions as represented in the plans and specifications, and gave formal notice that he elected to rescind the contract, indicating, however, that if adjustments could be made he would be willing to proceed. The contracting officer replied on December 14, 1932, denying the right of the plaintiff to rescind the contract and demanding the resumption of operations. Operations, however, were not resumed, and on January 3, 1933, the contracting officer sent plaintiff a letter stating that 430 of the 450 calendar days allowed for the completion of the contract had elapsed, and that less than 45% of the required earthwork had been constructed, and notifying him that his right to proceed with the work had been terminated. The defendant chose to relet the work to be done and it was let to other contractors who completed the construction of the levee.
The excess cost of completing the work over the amount specified in the original contract, after allowing credit for sums which plaintiff had earned in addition to the money which had been paid him prior to default was $37,653.20.
*505 Plaintiff sues for various items set out in his petition aggregating a total of $258,8'8'0.49, which he asserts he is entitled to recover.
Defendant pleads that plaintiff is not entitled to recover any sum, and that defendant is entitled to judgment on its counterclaim in the sum of $37,653.20.
Plaintiff bases his claim in the main on the alleged failure of the defendant to furnish the plaintiff the type of soil in the borrow pits which was suitable for the building of such a levee, and upon its failure to disclose to him the nature of the soil, the type of outside material, including cypress stumps, found in some of the borrow pits, as well as the excess moisture found in the soil.
Plaintiff’s first point is that defendant agreed to furnish plaintiff, without cost, clean earth, free from foreign material, which would not slough or show a tendency to slough. He cites Sections 13 and 22 (a) of the specifications. His reliance on these two provisions discloses that plaintiff wholly misinterpreted their meaning. Section 13 does provide that the defendant will furnish the right-of-way and earth for construcing the levee, but 22 (a) clearly places the obligation upon the contractor to select from the borrow pits the type of earth suited for the levees and as called for in the specifications. The plaintiff makes the same character of mistake in interpreting Section 19 of the specifications. He construes this section as a warranty on the part of the defendant that the material contained in the borrow pits was loam, whereas the specifications merely require that a B Section be constructed of loam, which of course was to be selected by the plaintiff from the material in the borrow pits.
The evidence shows that there was sufficient material for this purpose, which conclusion is further strengthened by the fact that the later contractor completed the work in a satisfactory manner with materials drawn from these same borrow pits.
Plaintiff’s second point that none of the material in the borrow pits was suited to the construction of a B Section levee is not borne out by the facts as disclosed by the evidence. Plaintiff actually built some of the embankment not only to the prescribed grade but higher than the grade specified.
*506 Plaintiff also emphasizes the fact that insufficient borings were taken and that these do not properly disclose the character of the soil which was actually found when the work began. Nowhere, however, does plaintiff contend that the charts of the borings show anything different from the true facts as disclosed by such borings. Only one boring was made for each thousand feet. There was no obligation on the part of the defendant to make any borings. However, there was an obligation on its part, if it did make borings, to fully disclose such facts as were found. This it did.
The chart classified the earth as disclosed by the borings as sandy loam, sandy clay, sand and loam, clay, loam, sand and silt, clay and silt, brown clay, soft brown clay and sand, soft blue clay, hard blue clay, and soft brown clay. The borrow pits contained sufficient of the type of material called for in the specifications for plaintiff to have constructed the levee in accordance with the contract.
The evidence rather clearly shows that the conditions found could not be called unusual. Any sort of investigation by the plaintiff, as disclosed by the various witnesses who testified, would have shown him that he would probably encounter wet soil; that it is not unusual to encounter cypress stumps; that water and such stumps are frequently found in that section, especially where there is an extra heavy growth of sugar cane, as in the instant case. The evidence further shows that defendant made no misrepresentation; that it Avithheld no information; that it accurately reported the borings, and that therefore the plaintiff was not misled in any way by representations of the Government.[1]
Looking over the entire record it appears to be a clear case of a man’s undertaking a large and responsible contract for a type of construction for which he was not equipped either by training or experience, in a section of the country where soil and water conditions were entirely different from those to which he had been accustomed, and where the methods of work required and conditions likely to be encountered were wholly unfamiliar to him.
*507 It is unfortunate, but the plaintiff duly signed the contract, which was awarded on his own bid, and voluntarily undertook its obligations. In view of the facts and circumstances as disclosed by the record we know of no way that he may avoid the legal consequences of his act.
Plaintiff is not entitled to recover against the defendant, ■and defendant is entitled to recover a judgment against the plaintiff on its counterclaim in the sum of $37,653.20.
It is so ordered.
MaddeN, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this, case.

 Trimount Dredging Co. v. United States, 80 C. Cls. 559; James Stewart & Co., Inc., v. United States, 94 C. Cls. 95.