GENERAL CASUALTY COMPANY OF AMERICA, Central Surety & Insurance Corporation, Wacker Corporation, and N. E. Daugherty, D/B/A N. E. Daugherty Construction Company

v.

The UNITED STATES.

No. 47331.

United States Court of Claims.

Jan. 11, 1955.

See, also, 101 F.Supp. 753.

806

Ernest Hubbell and Clifford B. Kimberly, Kansas City, Mo., for plaintiffs.

Carl Eardley, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This suit arises out of a contract to construct an airport at Zanesville, Ohio, and the petition is stated in two counts. Count one of the petition, a Lucas Act, 41 U.S.C.A. § 106 note, claim, was dismissed by this court on January 8, 1952.

Count two is a contract claim for equipment rental and expense, ditch rock excavation, gravel processing plant, overtime wages, delayed damages, unpaid balance of contract price, shale excavation and rock excavation.[1]

Plaintiff Daugherty entered into a contract with defendant, acting by and through the Civil Aeronautics Administration, for the construction of an airport at Zanesville, Ohio. The contract price was estimated to be $1,047,328. The accepted bid price included a unit price of 25 cents per cubic yard for grading and $1.35 per cubic yard for rock excavation.

On May 18, 1943, plaintiff Daugherty executed and delivered to the defendant payment and performance bonds both executed by plaintiffs, General Casualty Company and Central Surety & Insurance Corporation, in the sum of $418,931.20 each.

Plaintiff Daugherty received notice to proceed effective June 10, 1943. The project was to be completed within 150 calendar days thereafter. Daugherty began operations on June 17, 1943. The facts are sufficiently set out in the opinion below.

The plaintiffs' first cause of action is based upon the allegation that the Government coerced plaintiffs into equipping the job for full scale operations, after the cosureties had taken over the work, before a resumption date was apparent or determined.

Plaintiffs say that after the cosureties had taken over the work and near the end of the winter shutdown under a stop order issued by defendant, the cosureties were required to equip the job with the large amount of heavy construction machinery which would be required for full scale operations, long before a possible resumption date was apparent or determined.

i. No mention is made in plaintiffs' briefs as to processing plant claim or the claim for overtime wages. We assume and will treat them as having been abandoned. In any event the processing plant was installed at the election of the contractor, since the contract permitted the use of any one of several methods.

Plaintiffs further say that the co-sureties upon demand of defendant furnished evidence that they would be ready to perform when work could be resumed and for the purpose had sufficient equipment on the job to begin full scale operations by April 1, 1944. But defendant required the cosureties to comply with its demands that equipment be placed on the job forthwith and threatened that if they did not comply large payments due plaintiffs for work done would be withheld and made the further threat to default the cosureties on the contract. The cosureties say that such action on the part of the defendant was coercion and that in the period when they were required to equip the job from April 1 to May 10, 1944, they performed no pay item work and by having furnished the equipment demanded incurred thereby an unnecessary expense of $13,283.97.

The contract specifications provided, as to equipment, in part as follows:

"2.1 *General.* The Contractor shall maintain on the job sufficient equipment of the types needed to complete all the work in accordance with the requirements of this specification within the contract time. He may use any type of earth-moving equipment capable of accomplishing the specified and required results. * * *"

Daugherty made strong but unsuccessful efforts to get sufficient equipment which was in working order. He fell behind in rental payments on some equipment which was then withdrawn from the job by the equipment owners. After numerous warnings, it was finally necessary to terminate the right of Daugherty to proceed effective as of November 24, 1943.

An examination of the evidence indicates that defendant made two demands: (1) that plaintiffs furnish information concerning equipment availability by March 10; (2) that plaintiffs bring their equipment to the site by April 15, or sooner, if weather conditions permitted.

Since the damage about which plaintiffs complain concerns the loss of rental on equipment brought to the site in April, it is apparent that the alleged breach of contract concerns demand number two.

On January 28, 1944, the contracting officer advised plaintiffs that 52 calendar days remained for the completion of the work; that to complete in the contract time plaintiffs "must have sufficient equipment on the job by April 15, 1944, or sooner, if weather conditions permit, to operate on a full scale basis."

Normal grading operations commence in the Zanesville area about March 15, but due to unseasonable weather plaintiffs were not able to commence work until May 1 and notice to proceed was not issued until May 10. In January the reasonable expectation was that grading operations would commence about March 15. At that time, January, such a demand could not be called unreasonable. Thus, if the demand was not a breach of contract in January, it was not a breach of contract in April, for the plaintiffs' loss resulted not from compliance with the order but from the unseasonable weather which prevented the issuance of the notice to proceed at the expected time. It has been held that the Government is not responsible for the vagaries of the weather. Warren Brothers Roads Co. v. United States, 123 Ct.Cl. 48, 79, 105 F.Supp. 826.

Inasmuch as grading operations would normally commence about March 15, any prudent contractor would have been prepared to proceed shortly thereafter. Hence plaintiffs' movement of equipment to the site in April was a normal action and one which would have taken place regardless of any demand by the defendant.

Therefore, it must be concluded that plaintiffs brought the grading equipment to the site in April not because of threats, but because it was what any prudent contractor would have done. It was not a breach of the contract by the Government and the plaintiffs could not recover on this claim.

The plaintiffs' second claim is for recovery of the alleged cost of ditch rock excavation. Plaintiff Daugherty subcontracted the drainage work to the Weikel Construction Company.

The profile drawings of the drainage structures showed them to be located in an area and in a strata of soil classified on the boring log as "Horizon C" material defined as "hard, impervious, silty clay" which was "relatively hard and impervious."

In digging the trenches rock was encountered which had to be blasted and the subcontractor was paid therefor at the rate of $5 per cubic yard.

The fact that plaintiff Daugherty anticipated rock is evidenced by the terms of the subcontract. The uncontested evidence is that the subcontract carried a provision, the purport of which was to protect the subcontractor against rock should it be encountered. It also appears from the evidence that rock was anticipated below grade on this part of the job. The evidence further shows that blasting is ordinarily necessary because of the confined nature of this type of excavation.

Thus plaintiffs' contention that they are entitled to recover an additional amount because of an alleged changed condition is without foundation. Furthermore, there is nothing in the evidence to disclose that plaintiffs ever called the attention of the contracting officer to an alleged changed condition in connection with this portion of the work.

■ Either failure to show a changed condition or failure to give notice of a changed condition would prevent recovery of plaintiffs on this claim. Having failed to show a changed condition, this item of plaintiffs' claim is denied.

The third claim of plaintiffs is for the unpaid balance of contract price withheld from plaintiffs' cosureties and applied to payment of taxes owed by plaintiff Daugherty.

At the time Daugherty's contract was terminated defendant was indebted to him in the amount of $56,783.56 for work performed.

Defendant accepted the offer of the cosureties to complete the contract but stated that claim to all sums due under the contract at time of termination could not then be allowed since there was at the time of termination a valid assignment of money due under the contract in favor of the LaSalle Industrial Finance Corporation. This was satisfactory to the cosureties who then did go ahead with the work without a supplemental contract. On January 3, 1944, the Comptroller General certified as due the LaSalle Corporation, as assignee of Daugherty, the sum of $56,783.56. Before a check was issued, a tax levy was filed against the contractor in the amount of $45,366, in connection with the Zanesville contract and $12,863.10 assessed in connection with other work. The defendant thereupon refused the demand of the cosureties for payment of the amount earned by Daugherty prior to the termination of his right to proceed and by appropriate bookkeeping entries defendant set off the sum due Daugherty against his tax indebtedness.

■ Plaintiffs contend the surety companies had a prior lien to the amount in dispute and are entitled in this claim to recover said amount. The law is to the contrary. It has been settled that the Government which has funds in its possession may apply said funds against amounts owed to the Government by a prime contractor. United States v. Munsey Trust Company, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022; Standard Accident Insurance Company v. United States, 119 Ct.Cl. 749, 97 F.Supp. 829.

■ The contractor could not, by assignment, transfer greater rights than he had himself and as a matter of law the Government had the right to set off the sums due under the contract against the amount of taxes due and owing by plaintiff Daugherty. Thus, plaintiffs are not entitled to recover on this claim.

The plaintiffs' third cause of action is for rock and shale excavation.

The issues presented in this claim are (1) whether defendant misrepresented the materials; (2) whether the shale constituted a changed condition; (3) if so, whether Daugherty gave notice as required by article 4; (4) whether decision of a contracting officer, affirmed by the head of the department, that (a) there was no rock, (b) there was no notice of a changed condition, (c) there was no changed condition, are final and conclusive; (5) the extent of plaintiffs' recoverable damages, if any.

The site of the proposed airport was a rugged hilly country cut by deep ravines with ground elevations varying from elevation 870 to 917. It was estimated that approximately two million cubic yards of material would have to be moved in order to flatten out the site for airport purposes. To assist bidders the defendant made borings at intervals of 500 feet along the center lines of the runways and notified the bidders that hand augers were used for this purpose. Such augers bring up earth in granular form. At stages 33 on the E/W runway and 38 on the NW/SE runway, intermediate borings were made between the regular intervals mentioned. All borings, 35 in number, were represented by defendant on the contract drawings. The defendant's engineer making the hand auger borings, found the soil to lie generally in three horizons, as follows:

A. Brown topsoil, from zero to six inches in depth.

B. Yellow tan silty clay six inches to nine feet in depth.

C. Light tan silty clay and blue clay relatively impervious and hard from nine feet in depth to grade.

The engineer reported also some evidence of shale and loose rock below grade, but the charts and borings did not show that plaintiffs would encounter hard shale as found in later excavation. The borings were not all examined scientifically, but only four samples thereof were submitted to the Flood Soils Laboratory for analysis, and the table of soils characteristics in the contract drawings was apparently based upon the laboratory report. This fact was unknown to plaintiffs. The defendant did not deliberately misrepresent the materials it thought would be encountered or hold back any information it had from plaintiffs.

■■ There was a duty on the part of defendant, if it made borings, to fully disclose such facts as were found. Ranieri v. United States, 96 Ct.Cl. 494, 506. This it did, and we can find no reason to hold that the defendant misrepresented the facts to such an extent as to cause a breach of contract on its part.

The second, third, and fourth issues presented by this claim are for the purposes of this opinion grouped.

The borings and data made and furnished by defendant were inadequate, and plaintiffs encountered shale in locations and amounts seriously in excess of those indicated by the drawings. In these respects the contract drawings were not approximately correct. Plaintiff Daugherty's reasonably careful inspection of the site gave no indication to him that he would encounter materials any different from those represented on the contract drawings.

The total quantity of excavated materials moved was 2,056,262 cubic yards.

In July 1943 plaintiff Daugherty encountered hard shale and concluded that it could best be removed by breaking it up with a rooter. A rooter is a heavy blade which projects into the ground and operates on the principle of a plow. Daugherty's rooter had three teeth, but after experimentation it was found that in some areas the hard shale could more easily be rooted by removing two of the teeth, thus giving increased power to the operation. The rooter was powered by a crawler-type tractor having 110 drawbar horsepower. The hard shale could not have been removed by pans used in taking out clay without first rooting it. Considerable quantities of soft shale

were also encountered. This was "grading" and was handled with the same equipment, pans, and tractors as used on dirt.

The defendant classified the material, now claimed by the plaintiffs to have been hard shale and rock, as "grading" in each of the 1943 monthly estimates, and plaintiff Daugherty was paid upon that basis. Daugherty did, however, protest orally in September 1943 to the resident engineer about such payment. The following month in a letter to the engineer in charge of design and construction, he stated that 200,000 cubic yards of hard shale had been encountered slowing operations but did not claim a changed condition for purposes of reclassification or payment. Previously Daugherty's engineer and two successive superintendents made strong oral representations about a changed condition to defendant's resident engineer and his assistants and asked that payment be made for rock. This was refused upon the basis that it was being rooted and therefore was grading within the contract classifications. Plaintiffs' engineer also told the resident engineer that he was going to cross section the hard materials and make claims for additional compensation therefor. The resident engineer was requested to cross section the materials but declined to do so. Plaintiffs requested the resident engineer to have representatives present while plaintiffs took elevations, but he did not do so. The resident engineer did not report to the contracting officer the representations made by plaintiff Daugherty about the changed conditions encountered until March 30, 1944. The first such claim was made by the contractor in writing on February 4, 1944, after counsel had been retained and was for 193,000 cubic yards of rock alleged to have been excavated in 1943. This claim was denied February 10, 1944.

Plaintiff Daugherty had not excavated a shale bank near the runway intersection and when the work was resumed in 1944 the cosureties contended that this shale constituted rock within the contract definition. The pertinent specifications provided as follows:

"3.1  *General.* * * *

"All material encountered shall be considered as unclassified excavation unless otherwise specified. The Contractor shall inform and satisfy himself as to the character, quantity and distribution of all material to be excavated. No payment will be made for any excavated material which is used for purposes other than those designated. * *

\* \* \* \* \* \*

"3.3–b  *Classification of Excavation.* All excavated material will be classified as 'Grading,' or 'Rock Excavation.'

"(1) *Grading* shall consist of the removal and satisfactory disposal of all loam, sand, clay, gravel, soft shale, soft slate, old gravel, broken stone or bituminous macadam pavements, loose or decomposed rock, boulders of less than one-half ($\frac{1}{2}$) cubic yard in volume and all other materials not otherwise classified under these specifications.

"(2) *Rock Excavation.* Rock excavation shall include all solid rock and boulders having a volume of one-half ($\frac{1}{2}$) cubic yard or more, and all shale or ledge rock which cannot be removed with an extra heavy duty rooter powered with a crawler-type tractor having 110 drawbar horsepower in good condition and on firm footing, or a modern power shovel of three-fourths ($\frac{3}{4}$) cubic yard capacity in good condition, without continuous drilling or blasting; although blasting may be resorted to, to facilitate the work. * * *"

The special proposal conditions provided in part as follows:

"10.  LOCAL CONDITIONS: Bidders or their authorized agents are expected to inspect the site of the work or to otherwise thoroughly acquaint themselves with local conditions as may affect performance

of the contract and to reasonably anticipate the difficulties to be encountered therein.

"11. Borings: Borings where shown were made by means of a hand auger. Borings were made at the approximate locations shown on the drawings, and the character and depth of materials found are believed to be approximately correct. * * *"

The contract provided in part as follows:

"Article 3. *Changes.*—The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: *Provided, however,* That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.

"Article 4. *Changed conditions.*—Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.

\* \* \* \* \* \*

"Article 15. *Disputes.*—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed."

It was agreed that a test would be made to see if the material could be handled by a three-quarter cubic yard shovel without continuous drilling or blasting. The test was made in May 1944. The shovel handled the materials with difficulty, but was able to do so without drilling or blasting. The shovel did stick sometimes and it required several passes with the bucket to get a load, whereas in gravel, dirt, or clay this would not have been necessary. As a consequence of the test, defendant declined to pay for "rock." The plaintiffs' cosureties then completed the contract and were paid for "grading." The plaintiffs did not rely solely on the three-

quarter cubic yard shovel but also used a one-yard shovel which had more power, approximately twice the weight of the smaller shovel, and was more efficient. The material could have been moved with the smaller shovel alone without blasting, but this would have required much additional time which was not available. Even with the larger shovel the teeth would break off in the hard shale and both machines required considerable repair in this regard. This shale not only was hard to excavate and required more time than clay, but also did not compact well and required more loads to the fills, increasing costs.

It will be noted that article 4 of the contract provided "should the contractor encounter, * * * during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications * * *."

This case in principle is much like the case of Shepherd Co. v. United States, 125 Ct.Cl. 724, 737, 113 F.Supp. 648, 654, where the court said:

"We do not think there can be any question but that the wet material was unforeseen by both plaintiff and defendant. It was an unknown, subsurface condition differing materially from that shown by the drawings, specifications and borings, and one which could not have reasonably been anticipated from a study of the drawings, borings and samples, or by an examination of the site. * * * Plaintiff is therefore entitled under article 4 of the contract to recover the full excess costs of excavating, hauling, and placing the wet material on the fill, unless limited in his recovery by a matter hereinafter discussed."

In the instant case we do not think there can be any question but that there was an unknown subsurface condition differing materially from that shown by the drawings, specifications and borings, and one which could not have reasonably been anticipated from a study of the drawings, specifications and borings, or by an examination of the site.

Plaintiffs are therefore entitled, under article 4, of the contract, to recover the cost of excavating materials different from those shown on the drawings, specifications and borings, if notice was given as required by article 4.

Having found a changed condition under article 4, it then becomes necessary to determine whether Daugherty gave notice as required by article 4.

This question is also settled by the decision of this court in the Shepherd case, supra, wherein the court ruled that calling the attention of the resident engineer to conditions constituted compliance with article 4 of the contract.

Article 21(b) of the contract provided that "The term 'contracting officer' as used herein shall include his duly appointed successor or his authorized representative."

In both the Shepherd case and in the instant case the resident engineer was clothed by the contracting officer with authority to be on the job and see that the work was performed. In the Shepherd case the court held that the resident engineer was the authorized representative of the contracting officer, that the resident engineer had the duty to communicate to the contracting officer matters which were brought to his attention regarding conditions encountered in the excavation, and that notice to the resident engineer constituted compliance with the contract. In the instant case Daugherty protested orally to the resident engineer in September 1943 and a month later in a letter to the engineer called his attention to the fact that hard shale had been encountered. Previously Daugherty's engineer and two successive superintendents made strong oral representations about a changed condition to defendant's resident engineer and his assistants and asked that payment be for rock.

It would be inane indeed to suppose that the resident engineer was at the

site for no purpose. We believe as in the Shepherd case, supra, that the resident engineer was the authorized representative of the contracting officer.

Plaintiff Daugherty's responsibility ended when notice was given to the authorized representative of the contracting officer. If the resident engineer did nothing, certainly it was no fault of the plaintiff Daugherty. He did all that was required of him under the contract.

That plaintiffs' cosureties made claim of a changed condition in 1944 there can be no doubt. On March 30, 1944, the resident engineer acknowledged to his superior the fact that plaintiffs were claiming rock. The claim was made in writing under date of February 4, 1944, and was denied February 10, 1944.

■ When the contracting officer and the head of the department denied and failed to recognize a changed condition where plaintiff encountered 216,755 cubic yards of hard shale which was not indicated in the borings and contract drawings and which was more difficult of removal than grading, and when said officers failed to make an equitable adjustment for removal thereof, the determination was arbitrary and was not supported by substantial evidence.

Thus, the decision of the contracting officer, affirmed by the head of the department, is not final and conclusive and not binding on the parties hereto.

■ Therefore, we find that notice of a changed condition under article 4 was given the contracting officer and plaintiffs are entitled to recover because of such changed condition. Great Lakes Dredge & Dock Company v. United States, 116 Ct.Cl. 679, 90 F.Supp. 963, certiorari denied 342 U.S. 953, 72 S.Ct. 624, 96 L.Ed. 708; Loftis v. United States, 110 Ct.Cl. 551, 76 F.Supp. 816.

We then approach the question of the extent of plaintiffs' recoverable damages.

The following are the sums allowed and paid by the defendant on the disputed materials at 25 cents per cubic yard, the quantities and character of excavation claimed by plaintiffs, and the sums claimed therefor:

| | Cubic yards | Unit price | Total claimed | Allowed | Balance claimed |
|---|---|---|---|---|---|
| Hard shale | 418,851 | $0.65 | $272,253.15 | $104,712.75 | $167,540.40 |
| Ledge rock | 216,755 | 1.35 | 292,619.25 | 54,188.75 | 238,430.50 |
| | 635,606 | .............. | 564,872.40 | 158,901.50 | 405,970.90 |

The 418,851 cubic yards of material plaintiffs claim was hard shale and which had to be rooted was not hard shale and was removed in part with the equipment plaintiffs admit using thereon; viz., a rooter with three teeth powered by a crawler-type tractor having 110 drawbar horsepower, after which pans were used. There was no blasting. We believe that the material, while difficult of removal, was grading within the terms of the specifications, for which plaintiffs have been fully paid at the contract price for grading of 25 cents per cubic yard.

The 216,755 cubic yards was hard laminated shale of a type not shown on the contract drawings or by the defendant's original borings.

In May 1944 when the work was almost completed the defendant caused borings to be made by the H. C. Nutting Company, a firm of soil experts. Out of some 17 borings, three were made within the area where the plaintiffs contended they encountered shale and rock in excavation, and the borings showed shale of various characteristics, together with some conglomerate limestone. On two of the three holes the material was hard enough to get core samples with a rotary core drill with diamond tools for cutting. On the other holes a sample

tube was driven in with a No. 225 hammer using a three inch stroke.

To excavate this material required shovels and sometimes a rooter with one tooth powered by two tractors, one pushing and one pulling. The 216,755 cubic yards could not for the most part have been removed in any efficient manner without a one-yard shovel supplementing the three-quarter yard shovel and by being loosened in some areas with a single tooth rooter powered by two tractors. The job could have been completed with a rooter powered by one tractor and with the use of a three-quarter cubic yard shovel, but it would have taken "forever and a day." Plaintiffs did not have and were unable to obtain equipment and supplies required for extensive drilling and blasting.

In the completion of the project the cosureties expended the sum of $1,584,-942.27 of which $487,882.90 was a loss. The cosureties have paid up to December 31, 1951, a total of $493,991.64 which is the sum claimed by them of any judgment rendered herein.

Plaintiffs filed a claim for rock and shale excavation on February 17, 1945. The contracting officer denied the claim on June 4, 1945.

In addition, as we have heretofore noted, it was necessary to use a one-yard shovel, approximately twice the weight of the smaller shovel, and even then the teeth would break off in the hard shale causing considerable repairs and delays. This shale was not only hard to excavate and required more time, but did not compact well and required more loads to the fills, increasing costs.

It is apparent from the evidence that the 216,755 cubic yards of excavation was not rock nor was it grading within the terms of the contract for which the plaintiffs were paid at the contract price of 25 cents per cubic yard. A fair and reasonable price for excavation of hard shale would be approximately 65 cents per cubic yard.

Plaintiffs have been paid $54,188.75 at the contract price for grading.

Therefore, we find because of a changed condition under article 4 of the contract plaintiffs are entitled to judgment in the sum of $86,702, which is based upon excavation of 216,755 cubic yards at 65 cents per cubic yard, less the sum of $54,188.75 paid plaintiffs at the rate of 25 cents per cubic yard.

The final item of plaintiffs' claim is for $4,337.91, the amount withheld by defendant at the termination of plaintiffs' contract for delay under article 9 of the contract. Article 9 of the contract reads as follows:

"ARTICLE 9. *Delays—Damages.—* If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor's right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event the actual damages for the delay will be impossible to determine and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of

delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: *Provided,* That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto."

As we have previously stated, the delay in completing the job was due to unforeseen conditions encountered. Furthermore, the contractor did not refuse or fail to prosecute the work, or any separable part thereof, with such diligence as would insure its completion within the time specified in article 1, or any extension thereof.

In the light of the above and our decision as to changed conditions encountered, we believe the defendant had no right to withhold said sum as damages for delay. Plaintiff is entitled to judgment on this claim in the sum of $4,337.91.

Plaintiff Daugherty rented equipment and received property from the Maxon Construction Company, becoming indebted thereby in the sum of $875.32. The Maxon Construction Company assigned its claim to defendant. Daugherty is indebted to defendant in the sum of $875.32, and defendant is entitled to recover this amount from plaintiffs on its counterclaim.

JONES, Chief Judge, and MADDEN and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting).

The court says the refusal of the contracting officer to make an equitable adjustment when conditions were encountered differing from those shown on the contract documents was arbitrary and not supported by substantial evidence. I do not believe the record justifies this.

The specifications in section 3.3–b(1) defined grading to include soft shale, and in paragraph (2) defined rock excavation as follows:

"Rock excavation shall include all solid rock and boulders having a volume of one-half (½) cubic yard or more, and all shale or ledge rock which cannot be removed with an extra heavy duty rooter powered with a crawler-type tractor having 110 drawbar horsepower in good condition and on firm footing, or a modern power shovel of three-fourths (¾) cubic yard capacity in good condition, without continuous drilling or blasting * * *."

The opinion of the majority shows that the parties agreed on a test to see

if the material could be handled by a three-fourths (¾) cubic yard shovel without continuous drilling or blasting. The opinion stated the result of the test as follows:

"* * * The shovel handled the materials with difficulty, but was able to do so without drilling or blasting. The shovel did stick sometimes and it required several passes with the bucket to get a load, whereas in gravel, dirt, or clay this would not have been necessary. * * * The plaintiffs did not rely solely on the three-quarter cubic yard shovel but also used a one-yard shovel which had more power, approximately twice the weight of the smaller shovel, and was more efficient. The material could have been moved with the smaller shovel alone without blasting, but this would have required much additional time which was not available. Even with the larger shovel the teeth would break off in the hard shale and both machines required considerable repair in this regard. * * *"

As a consequence of the test made, defendant declined to pay for rock and insisted that the plaintiff was entitled to be paid only for "grading."

Had I been the contracting officer I might have come to a contrary conclusion, but I cannot say that his conclusion was arbitrary or not supported by substantial evidence, because of the provisions of section 3.3-b of the specifications. This section shows that it was contemplated that shale might be encountered. If it was soft shale it came within the scope of "grading" as defined in subparagraph (1). If it was hard shale, it was to be classified as "rock excavation" as defined in subparagraph (2). Shale was to be included within rock excavation only when it "cannot be removed with an extra heavy duty rooter powered with a crawler-type tractor having 110 drawbar horsepower in good condition and on firm footing, or a modern power shovel of three-fourths (¾) cubic yard capacity." The test showed that this shale could be removed with a power shovel of three-fourths cubicyard capacity. It is true it was difficult to so remove it, but it was not impossible and, hence, there was a basis for the contracting officer's determination that the material did not come within the definition of "rock excavation," but within the definition of "grading." There were but two classifications of excavation provided for in the contract, to wit, "grading" and "rock excavation." There was no intermediate classification.

I see no justification for making an equitable adjustment in the contract price. It is true the borings made by defendant did not show shale, but the specifications show that it was expected that shale might be encountered, and they provided payment for its excavation—as "grading" if it was soft, and as "rock" if it was hard. Under the specifications it had to be classified as one or the other; there was no intermediate classification.

There was a substantial basis for the contracting officer's determination that this was not rock excavation and, hence, it must be classified as "grading." Since there was substantial evidence to support the contracting officer's decision, it is binding on us.

I must, therefore, respectfully dissent.