Alvin H. LEAL, Trading as Plains Construction Company, and Mercantile National Bank at Dallas, a Corporation

v.

UNITED STATES.

No. 199-53.

United States Court of Claims.

April 6, 1960.

Charles E. Carlsen, Minneapolis, Minn., for plaintiffs. Ernest Hubbell, Kansas City, Mo., and Frank W. Mueller, St. Louis, Mo., were on the briefs.

John F. Wolf, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Clare E. Walker, New York City, was on the brief.

LARAMORE, Judge.

The plaintiffs claim that the contractor Leal (hereinafter referred to as plaintiff), in performing a contract with the Corps of Engineers of the War Department, encountered changed conditions within the scope of Article 4 of the contract, or in the alternative, that the defendant breached the contract by withholding from plaintiff information regarding ground water conditions, which changed conditions or withholding caused Leal to incur extra expense in performing the contract for which he should have been paid.

Plaintiff Mercantile National Bank of Dallas, Texas, is a party to this suit by reason of an assignment by plaintiff Leal on April 26, 1946.

The contract was entered into on April 17, 1946. As part of the construction of the Hulah Dam on the Caney River, a permanent stream in an alluvial valley in northeast Oklahoma, plaintiff was to excavate a temporary diversion channel, and to build part of the embankment. All suitable material from the diversion channel excavation, together with all other suitable material excavated from the spillway area and from designated borrow areas, were to be used in the construction of the rolled-fill embankment of the dam.

The diversion channel was to have its starting point at the Caney River, about 2,100 feet northwest of the dam axis and center line of the spillway, extend eastward intersecting Hickory Creek, and thence southeast to the point where the Caney River intersects the dam axis. It was 2,800 feet long, approximately 30 feet deep, with a bottom width of 40 feet at elevation 690, with one vertical on two horizontal side slopes. The elevation of the bottom grade of the diversion channel was 690, plus or minus, but to be determined in the field by the contracting officer. This elevation was fixed at 690 on the upstream end, decreasing to 688 at the downstream end to correspond with the elevation of the channel of the Caney River between these two points. The grade was established and the slopes staked out by the defendant in April 1946.

Plaintiff's bid of $699,917.00 was the lowest of the eleven bids submitted on the contract. The Government's estimate for the work involved was $769,767.50.

All of the work under the contract was completed on time, the contract completion date, as extended, being August 16, 1947.

In 1939, the Army Engineers had made subsurface explorations at the dam site by means of core borings, auger borings, test pits, and undisturbed sample borings. The primary purpose of the explorations was to test the strength of the foundation materials for the dam and determine their suitability for the embankment construction.

With the exception of core hole No. 12, which was located at the intersection of the left bank of the Caney River and the axis of the dam (through which point the southeast periphery of the diversion channel was cut), no subsurface explorations were ever performed within the limits of the work area of the diversion channel.

Prior to bidding, plaintiff Leal was furnished with the plans for construction of embankment and excavation for spillway for Hulah Dam, which included drawings of foundation explorations, borings made, and materials recovered. Drawing C104–4 is a profile of 35 borings and test pits made across the Caney River valley along the axis of the dam. The downstream end of the diversion channel intersects the left bank of the Caney

River at the axis of the dam. Hole number 12 contained a line drawn on its left side at the approximate elevation of 689, and the letters "WT" were written above this line. Ten of the other 34 borings along the-axis of the dam were labeled in a like manner. Although the legend at the bottom of the sheet did not contain an interpretation of the letters "WT," such letters were placed on the sheet to indicate the existence of a water table.

The work here in question was plaintiff's first experience with the construction of a diversion channel and the compacting of an earth-filled dam, although plaintiff had previous experience in excavating dirt and compacting it on a fill.

Mr. L. M. Bush, a consulting engineer, prepared the plaintiff's bid estimate for the work covered by the contract. He made preliminary investigations on the job site on three occasions in March 1946, the last of these occasions with plaintiff Leal. On these occasions, he took a set of the plans and drawings and specifications with him, examined the cores which were kept in the coring shed, looked over the general requirements, observed the river banks, studied the field conditions, and analyzed the plans and layout. Plaintiff Leal and Mr. Bush checked for possible ground water by walking the banks of the Caney River for about three-quarters of a mile in each direction from the axis of the dam. They found no seepage of water into the river from the river banks, and concluded that excavation in the diversion channel would be an entirely dry operation.

Mr. Bush went to the resident engineer's office on the second trip to the job site, but found he was not in. Neither Bush nor Leal made any further attempt to contact the resident engineer prior to the preparation of plaintiff's bid. During the period between February 21, 1946, and March 21, 1946, ten prospective bidders contacted the resident engineer, George A. McClaskey, and he personally escorted them around the job site. He pointed out the various phases of the job, including work on the embankment and the diversion channel. Several prospective bidders raised the question of ground water, indicating that they had expected to encounter ground water and wet material in the diversion channel.

The water table does not represent the maximum elevation at which wet material might be expected. Immediately above the water table there is a narrow zone of the fine-grain material, which usually ranges from about one to ten feet in thickness, which is kept constantly wet by capillary attraction. This zone is called the capillary fringe. The height of the capillary fringe depends upon the molecular forces of the soil particles. For example, coarse material, like gravel and sand, has a smaller capillary fringe than finer soil, like silt and sandy soil. The log record of explorations in adjacent areas revealed the existence of a fine-grained material, indicating that a capillary fringe up to five feet could be expected above the water table in the area of excavation for the diversion channel.

Prior to making his bid, plaintiff Leal and his estimator, examined the core borings on the job site and determined that the required excavation in the diversion channel would be a silty type of soil, but did not consider its capillary characteristics for absorption of underground water.

The plaintiff encountered water and saturated material at elevation 698, and, by letter dated September 4, 1946, advised the contracting officer that the resident engineer had instructed that the wet material be excavated to elevation 690, and compacted on the embankment as originally planned. Because he would incur increased costs and be delayed, plaintiff requested that the elevation of the diversion channel be raised above the level of the water or that the wet material be wasted. He also requested reimbursement for increased costs and an extension of time in the event it was found necessary to continue the operation as instructed by the resident engineer.

By letter dated September 11, 1946, the contracting officer denied plaintiff's requests, and instructed that he continue

with the excavation of the diversion channel and the compaction of the embankment in accordance with the specifications. On September 17, 1946, the plaintiff, by letter, advised the contracting officer that an exception would be taken to his decision.

On October 7, 1946, plaintiff appealed the decision of the contracting officer to the Secretary of War. This appeal was not submitted immediately to Washington, but was retained at the office of the District Engineer, Tulsa, Oklahoma, at the request of the plaintiff, who asked that his appeal remain there until further notice. This appeal claimed excess costs of $87,500 and 60 days' extension of time for completion of the contract.

Plaintiff stated that he did not know the meaning of the notation "WT" with respect to hole 12 on drawing C104-4 of the plans since it was not explained or labeled on the drawing and the ground water table was not otherwise indicated or disclosed.

Findings of Fact of the contracting officer, dated October 22, 1946, which accompanied the plaintiff's appeal, reported that the letters "WT" indicated the existence of a water table found by the cored holes and appeared on the drawings in accordance with customary practice. The contracting officer also determined that the wet material did not constitute a changed condition since the materials encountered did not differ materially from anything shown on the drawings, and that the wet material could reasonably have been expected in the excavation for the diversion channel to the approximate depth of the river channel.

Early in 1947, plaintiff requested that his claim be presented to the Corps of Engineers Claims and Appeals Board in Washington, D. C.

On May 9, 1947, plaintiff submitted a response to the Findings of Fact mentioned above which stated in part: "It is a sound conclusion that had the water encountered in the borings adjacent to the diversion channel been shown on the log record and symbolized as water on the log record drawings that the bid price of excavation would have reflected the cost of wet excavation * * *."

On May 15 and 16, 1947, plaintiff, represented by legal counsel, engineering representative O. M. Confer, and project engineer H. L. Bailey, appeared before the Corps of Engineers Claims and Appeals Board, Washington, D. C., which represented the Secretary of War, and presented their claim. This claim advanced the following principal contentions:

A. The letters "WT" on drawing C104-4 were not explained, and their meaning was unknown to the plaintiff. The existence of ground water in the diversion channel at elevations between 690 and 698 constituted a changed condition for which an equitable adjustment was claimed, in addition to an extension of time of 30 days.

B. The contracting officer erred in classifying wet excavation as suitable fill material instead of permitting it to be wasted, and that the requirement for its processing before compaction in the embankment constituted additional work for which an equitable adjustment was claimed, including an extension of time of 30 days.

On July 22, 1947, the Corps of Engineers Claims and Appeals Board denied plaintiff's claims, finding that there was no changed condition, and that no evidence had been presented which indicated that the plaintiff performed work in addition to that required by the contract specifications.

Plaintiff has now conceded in his requested findings that the symbol "WT" means "water table," although no explanation of these letters is made on the plans and drawings.

Plaintiff contends that the defendant withheld information as to a water table on many of the borings, and that these holes, for the most part, were bored in 1939 during one of the dryest periods in Oklahoma's history when there was no flow in the Caney River, whereas the drawings and plans furnished the bidders do not show the dates of the borings and

such drawings and plans are dated November 27, 1945.

Defendant's original logs of approximately 200 borings in the Caney River valley, which, for the most part, were completed in 1939, contained 48 holes where a water table was shown, but this information was not shown on the drawings or plans furnished the plaintiff. None of these holes was in the diversion channel area. Drawing C104–4, showing a profile of the axis of the dam with "WT" on 11 holes out of 35, could actually have shown a "WT" on 26 out of the 35 holes, had the water table data been transferred from the original log records to the papers and documents furnished bidders.

Since the Hulah Dam was built in an alluvial valley on a permanent river in northeastern Oklahoma, the geological structure is such that a water table could be expected at the water level of the river near its edge, rising in the ground areas as the distance away from the river increased. The indication of the water table on 11 of the 35 holes across the axis of the dam shows the general location of the water table across the valley.

The Trial Commissioner has found that there was sufficient information in the drawings to indicate to an experienced operator the existence of a water table in the valley, and that plaintiff and his estimator apparently failed to consider the geological structure in respect to the location of the dam site before submitting their bid, or they would have expected to encounter a water table at about the surface of the river, rising slowly at distances away from the river.

It was also found that the record did not show that any substantial delay in the embankment construction was caused by the use of wet material from the diversion channel, that no satisfactory evidence, in the form of books and records, was introduced by the plaintiff to show the cost of the wet excavation or that extra costs were incurred by him in drying the wet material before compacting it, and that plaintiff's method of operation in the diversion channel after encountering wet material was conducted in such a manner as to make working conditions more difficult, reduce normal production, and increase the cost of the work.

The plaintiff employed an elevating grader and self-loading scoops in excavating the diversion channel down to approximate elevation 702, where the ground would no longer support this type of equipment. Thereafter, the plaintiff employed a 2½ cubic yard dragline, of approximately 50 tons, to make the final cut of about 12 feet.

Plaintiff commenced excavation with the dragline at the upstream end of the diversion channel, adjacent to the Caney River, where the cut was made down to the required grade or bottom of the channel. A seepage occurred as soon as the cut was made, causing a ponding of the water in the work area. Sometimes the accumulation of water was as much as 3½ feet above final grade, and the material cut under water was mixed with the comparatively dry material at the top portion of the cut.

The defendant suggested to plaintiff on a number of occasions, both orally and in writing, the advantage of excavating from the downstream end of the channel to allow the free water to flow downstream out of the work area. Plaintiff continued excavation in the upstream end of the diversion channel for approximately one-third of its length because of a shorter haul route.

The plaintiff was requested, both orally and in writing, to pump the water from the work area in the diversion channel, as required by the specifications, but plaintiff had no pump on the job until September 16, 1946, and little effective pumping was done for sometime thereafter because of the poor condition of the pump and frequent breakdowns.

Ultimately the plaintiff cut a drainage pilot channel from the lower end of the diversion channel and performed the remaining two-thirds of the excavation to grade by working from the downstream end of the channel, and much water was

eliminated from the work area by natural drainage.

The first question we will treat is whether or not the defendant breached the contract by withholding from the plaintiff information in its possession concerning ground water conditions.

The plaintiff contends that the Government failed to furnish him with pertinent data in its possession concerning subsurface conditions which, if disclosed, would have warned him that wet material would be encountered, and that this amounts to a breach of the contract, entitling plaintiff to the damages flowing therefrom.

A study of the cases that have been decided in this area, which are too numerous to cite, makes it clear that each one must turn upon its own peculiar facts. The cases do, however, provide the framework of law within which the facts of a given case must be considered.

 We have held that the defendant has a duty, if it made borings, or was in possession of pertinent information, to fully disclose and furnish such facts as were found. General Casualty Company v. United States, 127 F.Supp. 805, 130 Ct.Cl. 520, 528; Ranieri v. United States, 96 Ct.Cl. 494, 506, certiorari denied, 317 U.S. 690, 63 S.Ct. 264, 87 L.Ed. 552. However, a bare withholding is not enough to make out a case. The plaintiff must show that he was in fact misled by the withholding of information. If the plaintiff knew or should have known that he would encounter wet material, although information was withheld, then it cannot be said that he was misled. Ragonese v. United States, 120 F.Supp. 768, 128 Ct.Cl. 156, 162.

 This leads us to a consideration of the facts to determine whether or not in this instance plaintiff was, in fact, misled by the withholding of information in the defendant's possession. We believe, after a careful scrutiny of all the evidence, that from the information furnished him, plaintiff either knew or should have known that a water table existed across the entire alluvial valley and that he would encounter wet material in the diversion channel. Consequently, plaintiff in fact was not misled by the information furnished or withheld. The facts upon which we base this conclusion are these: (1) Prior to the award of the contract, plaintiff advised that he intended to supply water for the Government buildings by digging a well, and one week after entering into the contract he submitted for defendant's approval drawings and specifications for a well 40 feet deep from elevation 805 to 765 about 750 yards from the diversion channel; (2) the only core hole within the limits of the work area (core hole No. 12) indicated the presence of a water table at approximately elevation 689; (3) several prospective bidders raised the question of ground water, indicating that they expected to encounter ground water and wet material in the diversion channel; (4) the log record of explorations in adjacent areas revealed the existence of a fine-grained material, indicating that a capillary fringe up to five feet could be expected above the water table in the area of excavation for the diversion channel; (5) the specifications clearly contemplated the existence of ground water in the course of the work. Paragraph 2-01 of the specifications required that "all permanent work shall be done in the dry," and that "the contractor shall keep the work free from water until that portion of the permanent work below the water level is completed." Paragraph 3-01(b) dealing with "Excavation" provided that "The contractor shall at all times take such precautions as are necessary to keep work free from ground and surface water"; (6) 11 of the 35 holes across the axis of the dam indicated a water table across the valley; (7) plaintiff and his estimator apparently failed to consider the geological structure in respect to the location of the dam site before submitting their bid, or they would have expected to encounter a water table at about the surface of the river, rising slowly at distances away from the river; and (8) there was sufficient information in the drawings and

specifications to indicate to an experienced operator the existence of a water table in the valley.[1]

Thus, from the information furnished him, we think that the plaintiff should have known that he would encounter wet material, and he has not shown, to our satisfaction, that he was in fact misled, and thereby damaged. As a matter of fact, plaintiff has failed to show anything other than his own determination that would support a conclusion that wet material would not be encountered. There is nothing in the plans, specifications, or record that suggests or indicates that the material to be encountered by the plaintiff would be dry.

Beyond question, the Government did not furnish plaintiff with all the information in its possession, but the failure to furnish said information did not mislead the plaintiff and thus he was not damaged thereby. We do not see how plaintiff can be heard to complain about being misled by the withholding of information, when admittedly he did not, prior to bidding, fully understand the information that was furnished to him, and made no effort to find out what "WT" meant.

Plaintiff argues alternatively that when it became necessary to excavate and compact wet material, he encountered changed conditions within the scope of Article 4 of the contract, which is as follows:

"Article 4. Changed conditions. —Should the Contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordi-

narily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the Contracting Officer shall be called immediately to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the Secretary of War or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions."

In previous cases involving Article 4 situations, we have held that the plaintiff was entitled to recover if he encountered unknown subsurface conditions differing materially from that shown by the drawings, specifications, and borings, and one which could not have been reasonably anticipated from a study of the drawings, specifications and borings, or by an examination of the site. General Casualty Company supra; Shepherd v. United States, 113 F.Supp. 648, 125 Ct. Cl. 724. But, if the contractor miscalculated, he cannot recover. Blauner Construction Company v. United States, 94 Ct.Cl. 503, 510–511; C. W. Blakeslee & Sons, Inc. v. United States, 89 Ct.Cl. 226, 250; General Contracting Corp. v. United States, 96 Ct.Cl. 255, 278.

The facts set out above that led us to the conclusion that the plaintiff was not misled also cause us to conclude that he simply miscalculated and did not heed the warning signs in the specifications and drawings furnished, which information was sufficient to inform an experienced contractor that water would

---

1. In respect to this, plaintiff says that he did not know the meaning of the notation "WT" on the drawings. However, plaintiff's bid was prepared by a consulting engineer, and it seems incredible that neither a contractor nor an engineer would know the meaning of "WT" in the context in which it was used. In any event, a simple inquiry would have revealed the

meaning of the notation. Furthermore, plaintiff says he concluded that the 11 holes marked "WT" indicated only pockets of water and not a water table that would extend across the entire valley. This conclusion is inconsistent with his claim that at the time of bidding he did not know the meaning of "WT".

385

be encountered. Therefore, it cannot be said that he encountered changed conditions which were compensable under Article 4. The Claims and Appeals Board was correct in denying plaintiff's claim on the ground that no changed conditions were encountered, and the trial *de novo* in this court supports that decision.

Since we find in the defendant's favor on the question of liability, it is unnecessary to treat the other arguments raised by both parties.

The plaintiffs' petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN and WHITAKER, Judges, concur.