LakamoRe, Judge,
delivered the opinion of the court:
The plaintiffs claim that the contractor Leal (hereinafter referred to as plaintiff), in performing a contract with the Corps of Engineers of the War Department, encountered changed conditions within the scope of Article 4 of the contract, or in the alternative, that the defendant breached the contract by withholding from plaintiff information regarding ground water conditions, which changed conditions or withholding caused Leal to incur extra expense in performing the contract for which he should have been paid.
Plaintiff Mercantile National Bank of Dallas, Texas, is a *453 party to this suit by reason of an assignment by plaintiff Leal on April 26, 1946.
The contract was entered into on April 17,1946. As part of the construction of the Hulah Dam on the Caney Liver, a permanent stream in an alluvial valley in northeast Oklahoma, plaintiff was to excavate a temporary diversion channel, and to build part of the embankment. All suitable material from the diversion channel excavation, together with all other suitable material excavated from the spillway area and from designated borrow areas, were to be used in the construction of the rolled-fill embankment of the dam.
The diversion channel was to have its starting point at the Caney Liver, about 2,100 feet northwest of the dam axis and center line of the spillway, extend eastward intersecting Hickory Creek, and thence southeast to the point where the Caney Liver intersects the dam axis. It was 2,800 feet long, approximately 30 feet deep, with a bottom width of 40 feet at elevation 690, with one vertical on two horizontal side slopes. The elevation of the bottom grade of the diversion channel was 690, plus or minus, but to be determined in the field by the contracting officer. This elevation was fixed at 690 on the upstream end, decreasing to 688 at the downstream end to correspond with the elevation of the channel of the Caney Liver between these two points. The grade was established and the slopes staked out by the defendant in April 1946.
Plaintiff’s bid of $699,917.00 was the lowest of the eleven bids submitted on the contract. The Government’s estimate for the work involved was $769,767.50.
All of the work under the contract was completed on time, the contract completion date, as extended, being August 16, 1947.
In 1939, the Army Engineers had made subsurface explorations at the dam site by means of core borings, auger borings, test pits, and undisturbed sample borings. The primary purpose of the explorations was to test the strength of the foundation materials for the dam and determine their suitability for the embankment construction.
With the exception of core hole No. 12, which was located at the intersection of the left bank of the Caney Liver and *454 the axis of the dam (through which point the southeast periphery of the diversion channel was cut), no subsurface explorations were ever performed within the limits of the work area of the diversion channel.
Prior to bidding, plaintiff Leal was furnished with the plans for construction of embankment and excavation for spillway for Hulah Dam, which included drawings of foundation explorations, borings made, and materials recovered. Drawing C104-4 is a profile of 35 borings and test pits made across the Caney Eiver valley along the axis of the dam. The downstream end of the diversion channel intersects the left bank of the Caney Eiver at the axis of the dam. Hole number 12 contained a line drawn on its left side at the approximate elevation of 689, and the letters “WT” were written above this line. Ten of the other 34 borings along the axis of the dam were labeled in a like manner. Although the legend at the bottom of the sheet did not contain an interpretation of the letters “WT,” such letters were placed on the sheet to indicate the existence of a water table.
The work here in question was plaintiff’s first experience with the construction of a diversion channel and the compacting of an earth-filled dam, although plaintiff had previous experience in excavating dirt and compacting it on a fill.
Mr. L. M. Bush, a consulting engineer, prepared the plaintiff[1]’s bid estimate for the work covered by the contract. He made preliminary investigations on the job site on three occasions in March 1946, the last of these occasions with plaintiff Leal. On these occasions, he took a set of the plans and drawings and specifications with him, examined the cores which were kept in the coring shed, looked over the general requirements, observed the river banks, studied the field conditions, and analyzed the plans and layout. Plaintiff Leal and Mr. Bush checked for possible ground water by walking the banks of the Caney Eiver for about three-quarters of a mile in each direction from the axis of the dam. They found no seepage of water into the river from the river banks, and concluded that excavation in the diversion channel would be an entirely dry operation.
*455 Mr. Bush, want to the resident engineer’s office on the second trip to the j ob site, but found he was not in. Neither Bush, nor Leal made any further attempt to contact the resident engineer prior to the preparation of plaintiff’s bid. During the period between February 21, 1946, and March 21, 1946, ten prospective bidders contacted the resident engineer, George A. McClaskey, and he personally escorted them around the job site. He pointed out the various phases of the job, including work on the embankment and the diversion channel. Several prospective bidders raised the question of ground water, indicating that they had expected to encounter ground water and wet material in the diversion channel.
The water table does not represent the maximum elevation at which wet material might be expected. Immediately above the water table there is a narrow zone of the fine-grain material, which usually ranges from about one to ten feet in thickness, which is kept constantly wet by capillary attraction. This zone ’ is called the capillary fringe. The height of the capillary fringe depends upon the molecular forces of the soil particles. For example, coarse material, like gravel and sand, has a smaller capillary fringe than finer soil, like silt and sandy soil. The log record of explorations in adjacent areas revealed the existence of a fine-grained material, indicating that, a capillary fringe up to five feet could be expected above the water table in the area of excavation for the diversion channel.
Prior to making his bid, plaintiff Leal and his estimator examined the core borings on the job site and determined that the required excavation in the diversion channel would be a silty type of soil, but did not consider its capillary characteristics for absorption of underground water.
The plaintiff encountered water and saturated material at elevation 698, and, by letter dated September 4, 1946, advised the contracting officer that the resident engineer had instructed that the wet material be excavated to elevation 690, and compacted on the embankment as originally planned. Because he would incur increased costs and be delayed, plaintiff requested that the elevation of the diversion chan *456 nel be raised above the level of the water or that the wet material be wasted. Pie also requested reimbursement for increased costs and an extension of time in the event it was found necessary to continue the operation as instructed by the resident engineer.
By letter dated September 11,1946, the contracting officer denied plaintiff’s requests, and instructed that he continue with the excavation of the diversion channel and the compaction of the embankment in accordance with the specifications. On September 17, 1946, the plaintiff, by letter, advised the contracting officer that an exception would be taken to his decision.
On October 7, 1946, plaintiff appealed the decision of the contracting officer to the Secretary of War. This appeal was not submitted immediately to Washington, but was retained at the office of the District Engineer, Tulsa, Oklahoma, at the request of the plaintiff, who asked that his appeal remain there until further notice. This appeal claimed excess costs of $87,500 and 60 days’ extension of time for completion of the contract.
Plaintiff stated that he did not know the meaning of the notation “WT” with respect to hole 12 on drawing C104-4 of the plans since it was not explained or labeled on the drawing and the ground water table was not otherwise indicated or disclosed.
Findings of Fact of the contracting officer, dated October 22, 1946, which accompanied the plaintiff’s appeal, reported that the letters “WT” indicated the existence of a water table found by the cored holes and appeared on the drawings in accordance with customary practice. The contracting officer also determined that the wet material did not constitute a changed condition since the materials encountered did not differ materially from anything shown on the drawings, and that the wet material could reasonably have been expected in the excavation for the diversion channel to the approximate depth of the river channel.
Early in 1947, plaintiff requested that his claim be presented to the Corps of Engineers Claims and Appeals Board in Washington, D.C.
*457 On May 9,1947, plaintiff submitted a response to the Findings of Fact mentioned above which stated in part: “It is a sound conclusion that had the water encountered in the borings adjacent to the diversion channel been shown on the log record and symbolized as water on the log record drawings that the bid price of excavation would have reflected the cost of wet excavation * *
On May 15 and 16, 1947, plaintiff, represented by legal counsel, engineering representative O. M. Confer, and project engineer H. L. Bailey, appeared before the Corps of Engineers Claims and Appeals Board, Washington, D.C., which represented the Secretary of War, and presented their claim. This claim advanced the following principal contentions:
A. The letters “WT” on drawing C104 — 4 were not explained, and their meaning was unknown to the plaintiff. The existence of ground water in the diversion channel at elevations between 690 and 698 constituted a changed condition for which an equitable adjustment was claimed, in addition to an extension of time of 30 days.
B. The contracting officer erred in classifying wet excavation as suitable fill material instead of permitting it to be wasted, and that the requirement for its processing before compaction in the embankment constituted additional work for which an equitable adjustment was claimed, including an extension of time of 30 days.
On July 22, 1947, the Corps of Engineers Claims and Appeals Board denied plaintiff’s claims, finding that there was no changed condition, and that no evidence had been presented which indicated that the plaintiff performed work in addition to that required by the contract specifications.
Plaintiff has now conceded in his requested findings that the symbol “WT” means “water table,” although no explanation of these letters is made on the plans and drawings.
Plaintiff contends that the defendant withheld information as to a water table on many of the borings, and that these holes, for the most part, were bored in 1939 during one of the dryest periods in Oklahoma’s history when there was no flow in the Caney River, whereas the drawings and plans furnished the bidders do not show the dates of the *458 borings and such drawings and plans are dated November 27,1945.,
Defendant’s original logs of approximately 200 borings in the Caney Diver valley, which, for the most part, were completed in 1939, contained 48 holes where a water table was shown, but this information was not shown on the drawings or plans furnished the plaintiff. None of these holes was in the diversion channel area. Drawing C104-4, showing a profile of the axis of the dam with “WT” on 11 holes out of 35, could actually have shown a “WT” on 26 out of the 35 holes, had the water table data been transferred from the original log records to the papers and documents furnished bidders.
Since the Hulah Dam was built in an alluvial valley on a permanent river in northeastern Oklahoma, the geological structure is such that a water table could be expected at the water level of the river near its edge, rising in the ground areas as the distance away from the river increased. The indication of the water table on 11 of the 35 holes across the axis of the dam shows the general location of the water table across the valley.
The Trial Commissioner has found that there was sufficient information in the drawings to indicate to an experienced operator the existence of a water table in the valley, and that plaintiff and his estimator apparently failed to consider the geological structure in respect to the location of the dam site before submitting their bid, or they would have expected to encounter a water table at about the surface of the river, rising slowly at distances away from the river.
It was also found that the record did not show that any substantial delay in the embankment construction was caused by. the use of - wet 'material. from. the...diversion channel, that no satisfactory evidence, in the form of books and records, was introduced by the plaintiff to show the cost of the wet excavation or that extra costs were incurred by him in drying the wet material before compacting it, and that plaintiff’s method of operation in the diversion channel after encountering wet material was conducted in such a maimer as to make working conditions more difficult, reduce normal production, and increase the cost of the work.
*459 The plaintiff employed an elevating grader and self-loading scoops in excavating the diversion channel down to approximate elevation 702, where the ground would no longer support this type of equipment. Thereafter, the plaintiff employed a 2y2 cubic yard dragline, of approximately 50 tons, to make the final cut of about 12 feet.
Plaintiff commenced excavation with the dragline at the upstream end of the diversion channel, adjacent to the Caney Eiver, where the cut was made down to the required grade or bottom of the channel. A seepage occurred as soon as the cut was made, causing a ponding of the water in the work area. Sometimes the accumulation of water was as much as 3% feet above final grade, and the material cut under water was mixed with the comparatively dry material at the top portion of the cut.
The defendant suggested to plaintiff on a númber of occasions, both orally and in writing, the advantage of excavating from the downstream end of the channel to allow the free water to flow downstream out of the work area. Plaintiff continued excavation in the upstream end of the diversion channel for approximately one-third of its length because of a shorter haul route.
The plaintiff was requested, both orally and in writing, to pump tire water from the work area in the diversion channel, as required by the specifications, but plaintiff had no pump on the job until September 16,1946, and little effective pumping was done for some time thereafter because of the poor condition of the pump and frequent breakdowns.
Ultimately the plaintiff cut a drainage pilot channel from the lower end of the diversion channel and performed the remaining two-thirds of the excavation to grade by working from the downstream end of the channel, and much water was eliminated from the work area by natural drainage.
The first question we will treat is whether or not the defendant breached the contract by withholding'from the plaintiff information in its possession concerning ground water conditions.
The plaintiff contends that the Government failed to furnish him with pertinent data in its possession concerning subsurface conditions which, if disclosedj would have warned *460 him that wet material would be encountered, and that this amounts to a breach of the contract, entitling plaintiff to the damages flowing therefrom.
A study of the cases that have been decided in this area, which are too numerous to cite, makes it clear that each one must turn upon its own peculiar facts. The cases do, however, provide the framework of law within which the facts of a given case must be considered.
We have held that the defendant has a duty, if it made borings, or was in possession of pertinent information, to fully disclose and furnish such facts as were found. General Casualty Company, et al. v. United States, 130 Ct. Cl. 520, 528; Ranieri v. United States, 96 Ct. Cl. 494, 506, cert. denied, 317 U.S. 690. However, a bare withholding is not enough to make out a case. The plaintiff must show that he was in fact misled by the withholding of information. If the plaintiff knew or should have known that he would encounter wet material, although information was withheld, then it cannot be said that he was misled. Ragonese v. United States, 128 Ct. Cl. 156, 162.
This leads us to a consideration of the facts to determine whether or not in this instance plaintiff was, in fact, misled by the withholding of information in the defendant’s possession. We believe, after a careful scrutiny of all the evidence, that from the information furnished him, plaintiff either knew or should have known that a water table existed across the entire alluvial valley and that he would encounter wet material in the diversion channel. Consequently, plaintiff in fact was not misled by the information furnished or withheld. The facts upon which we base this conclusion are these: (1) Prior to the award of the contract, plaintiff advised that he intended to supply water for the Government buildings by digging a well, and one week after entering into the contract he submitted for defendant’s approval drawings and specifications for a well 40 feet deep from elevation 805 to 765 about 750 yards from the diversion channel; (2) the only core hole within the limits of the work area (core hole No. 12) indicated the presence of a water table at approximately elevation 689; (3) several prospective bidders raised the questiton of ground water, indicating that they expected *461 to encounter ground water and wet material in the diversion channel; (4) the log record of explorations in adjacent areas revealed the existence of a fine-grained material, indicating that a capillary fringe up to five feet could be expected above the water table in the area of excavation for the diversion channel; (5) the specifications clearly contemplated the existence of ground water in the course of the work. Paragraph 2-01 of the specifications required that “all permanent work shall be done in the dry,” and that “the contractor shall keep the work free from water until that portion of the permanent work below the water level is completed.” Paragraph 3-01 (b) dealing with “Excavation” provided that “The contractor shall at all times take such precautions as are necessary to keep work free from ground and surface water”; (6) 11 of the 35 holes across the axis of the dam indicated a water table across the valley; (7) plaintiff and his estimator apparently failed to consider the geological structure in respect to the location of the dam site before submitting their bid, or they would have expected to encounter a water table at about the surface of the river, rising slowly at distances away from the river; and (8) there was sufficient information in the drawings and specifications to indicate to an experienced operator the existence of a water table in the valley.[1]
Thus, from the information furnished him, we think that the plaintiff should have known that he would encounter wet material, and he has not shown, to our satisfaction, that he was in fact misled, and thereby damaged. As a matter of fact, plaintiff has failed to show anything other than his own determination that would support a conclusion that wet material would not be encountered. There is nothing in the plans, specifications, or record that suggests or indicates that the material to be encountered by the plaintiff would be dry.
*462 Beyond question, the Government did not furnish plaintiff with all the information in its possession, but the failure to furnish said information did not mislead the plaintiff and thus he was not'damaged thereby. We do not see how plaintiff can be heard to complain about being misled by the withholding of information, when admittedly he did not, prior to bidding, fully understand the information that was furnished to him, and made no effort to find out what “WT” meant.
Plaintiff argues alternatively that when it became necessary to excavate and compact wet material, he encountered changed conditions within the scope of Article 4 of the contract, which is as follows:
ABTICLE 4. Changed conditions. — Should the Contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from, those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the Contracting Officer shall be called immediately to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the Secretary of War or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
In previous cases involving Article 4 situations, we have held that the plaintiff was entitled to recover if he encountered unknown subsurface conditions differing materially from that shown by the drawings, specifications, and borings, and one which could not have been reasonably anticipated from a study of the drawings, specifications and borings, or by an examination of the site. General Casualty Company et al., supra; Shepherd v. United States, 125 Ct. Cl. 724. But, if the contractor miscalculated, he cannot recover. Blauner Construction Company v. United States, 94 Ct. Cl. 503, 510-511; C. W. Blakeslee & Sons, Inc. v. United States, *463 89 Ct. Cl. 226, 250; General Contracting Corp. v. United States, 96 Ct. Cl. 255, 278.
The facts set out above that led us to the conclusion that the plaintiff was not misled also cause us to conclude that he simply miscalculated and did not heed the warning signs in the specifications and drawings furnished, which information was sufficient to inform an experienced contractor that water would be encountered. Therefore, it cannot be said that he encountered changed conditions which were com-pensable under Article 4. The Claims and Appeals Board was correct in denying plaintiff’s claim on the ground that no changed conditions were encountered, and the trial de novo in this court supports that decision.
Since we find in the defendant’s favor on the question of liability, it is unnecessary to treat the other arguments raised by both parties.
The plaintiffs’ petition will be dismissed.
It is so ordered.
Maddest, Judge; Whitaker, Judge, and JoNes, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff Alvin H. Leal is an individual now residing in Ardmore, Oklahoma. On May 13, 1953, plaintiff filed a petition claiming $105,875 for (1) breach of contract for withholding information regarding ground water conditions, (2) changes made by the contracting officer, and (3) changed conditions encountered in the performance of the contract. The petition, was later amended to -reflect, a total claim of .$338,655.' .Luring .the period .material to this litigation, he was. engaged in business, ás. ah eárth-móving contractor under the name and style of the Plains Construction Company, and had his office in Oklahoma City, Oklahoma.
The Mercantile National Bank of Dallas, Texas, also a plaintiff in this action, is a creditor of Leal by reason of an assignment of the income from the contract in suit, and a subsequent assignment of. 13Ys percent of the -proceeds of the instant suit.
*464 2. Plaintiff Leal bad been employed in the construction business by his father and brother from the early 1930’s until 1941, and in 1941 he organized the Plains Construction Company. He had considerable experience in general road construction involving grading, surfacing, and paving, and during World War II constructed airport runways. Prior to Leal’s performance of the instant contract, his largest contract had been for $250,000 for highway construction. The work at Hulah Dam, which is the subject of this suit, was plaintiff’s first experience with the construction of a diversion channel and the compacting of an earth-filled dam, but plaintiff had previous experience in excavating dirt and compacting it on a fill.
3. On February 21, 1946, the defendant, represented by the War Department, United States Engineer’s Office, Corps of Engineers, Tulsa, Oklahoma, issued invitations for bids for the construction of the embankment and excavation for the spillway of Hulah Dam, Arkansas Eiver Watershed, Caney River, in Osage County, Oklahoma. The bids were opened on March 21, 1946. The lowest bid, $699,917, based on a schedule of unit prices for estimated quantities, was submitted by Alvin H. Leal, trading as Plains Construction Company. The Government’s estimate for this work was $769,767.50. There were ten other bidders.
4. On April 17, 1946, plaintiff entered into a written contract, No. W 34 — 066 eng-477, with defendant. C. H. Chor-pening, Colonel, Corps of Engineers, signed the contract on behalf of defendant as the contracting officer. Performance of the contract was to be completed not later than four hundred calendar days after the date of receipt by the contractor of the notice to proc'eed. Such notice was received On May 21, 1946. Plaintiff whs given extensions of time for the completion of the contract from June 25,1947, to August 16, 1947, Be’cauSe Of Unusually severe Weather in November 1946, April 1947, and May 1947. Included in this is a five-day extension for the performance of other operations not covered in the contract. Plaintiff completed the contract on August 7,1947.
5. The contract work was part of the Hulah Dam and Reservoir Project located about thirteen miles northwest of *465 Bartlesville, Oklahoma, for flood control of the Caney River tributary of the Verdigris River and for water supply purposes. This project was authorized by the Flood Control Act of 1936, Public Law 738, 74th Cong., 49 Stat. 1570, approved June 22,1936.
6. The contract required the contractor to furnish all plant, labor, and materials, and to perform all work in strict accordance with the plans and specifications for construction of part of the embankment and excavation for spillway for the Hulah Dam on the Caney River. The Caney River is a permanent stream in an alluvial valley in northeast Oklahoma. Construction of the embankment had been divided into two major contracts: Contract No. W 34-066 eng-477 called for the construction of a portion of the embankment to about elevation 751 across the left bank flood plain of the Caney River. Under another contract, the embankment was to be extended across the river valley and raised to elevation 777.
7. Plaintiff’s contract required the construction of a temporary diversion channel in order to divert the flow of the Caney River during construction of the spillway and to facilitate construction of that portion of the embankment adjacent to the right bank of the river. The diversion channel was to have its starting point at the Caney River, about 2,100 feet northwest of the dam axis and center line of the spillway, extend eastward intersecting Hickory Creek, and thence southeast to the point where the Caney River intersects the dam axis.
8. The diversion channel was 2,800 feet long, approximately 30 feet deep, with a bottom width of 40 feet at elevation 690, with one vertical on two horizontal side slopes. The elevation of the bottom grade of the diversion channel was 690, plus or minus, but to be determined in the field by the contracting officer. This elevation was fixed at 690 on the upstream end, decreasing to 688 at the downstream end to correspond with the elevation of the channel of the Caney River between these two points. The grade was established and the slopes staked out by the defendant in April 1946.
9. All suitable materials from the diversion channel excavation, together with all other suitable materials excavated *466 from the spillway area and from designated borrow areas, were to be used in the construction of the rolled-fill embankment of the dam.
The embankment extended about 2,600 feet across the left bank flood plain from a point about 300 feet from the river channel. It rose approximately 35 feet from the original ground surface. It was about 160 feet wide at its top elevation of 751 feet, and about 380 feet wide at the bottom.
10. A quantity of 343,893 cubic yards of material was excavated from the diversion channel, almost all of which was classified as excavation common under the contract, and was paid for at the bid rate of 29 cents per cubic yard. This price included delivery of the material to the embankment for compaction. Plaintiff bid and was paid at a rate of 10 cents per cubic yard for compaction of 985,529 cubic yards of material on the embankment, which was obtained from the various sources described in finding 9.
11. The contract provided, in part, as follows:
ARTICLE 3. Changes. — The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this Article must be asserted within 10 days from the date the change is ordered: Provided, however, That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the Secretary of War or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this Article shall excuse the Contractor from proceeding with the prosecution of the work so changed.
ARTICLE 4. Changed conditions. — Should the Contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications *467 or unknown conditions of an unnsnal nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the Contracting Officer shall be called immediately to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the Secretary of War or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
*****
AETICLE 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer subject to written appeal by the Contractor within 30 days to the Head of the Department concerned or his duly authorized representative whose decision shall be final and conclusive upon the parties hereto. In the meantime the Contractor shall diligently proceed with the work as directed.
❖ * ❖ * *
AETICLE 23. Assignment of rights hereunder.— (a)Claims for monies due or to become due the Contractor from the Government under this contract may be assigned to a bank, trust company or other financing institution, including any Federal lending agency: Any such assignment shall cover all amounts payable under this contract and not already paid, and shall not be made to more than one party, except that any such assignment may be made to one party as agent or trustee for two or more parties participating in such financing.
(b) In the event of any such assignment the assignee shall file four signed copies of a written notice of the assignment, together with one copy of the instrument of assignment, with each of the following:
(i) General Accounting Office;
(ii) the Contracting Officer;
(iii) the surety or sureties upon the bond or bonds, if any, in connection with this contract;
(iv) the officer designated in this contract to make payments thereunder.
(c) Any claim under this contract which has been assigned pursuant to the foregoing provisions of this Article may be further assigned and reassigned to a *468 bank, trust company or other financing institution, including any Federal lending agency. In the event of such further assignment or reassignment the assignee shall file one signed copy of a written notice of the further assignment or reassignment together with a true copy of the instrument of further assignment or reassignment with the contractor; and shall file four signed copies of such written notice and one copy of such instrument with each of the parties designated in the preceding paragraph.
(d) No assignee shall divulge any information concerning the contract except to those persons concerned with the transaction.
(e) Payment to an assignee of any claim under this contract shall not be subject to reduction or setoff for any indebtedness of the assignor to the United States arising independently of this contract.
(f) Indication of the assignment of claim and of any further assignment thereof and the name of the assignee will be made on all vouchers or invoices certified by the Contractor.
The specifications provided, in part, as follows:
GC-2. Site Investigation and Representations. — The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads and uncertainties of weather, river stages, tides, or similar physical conditions at the site, the conformation and condition of the ground, the character, quality and quantity of surface and subsurface materials to be encountered, the character of equipment and facilities needed preliminary to and during the prosecution of the work and all other matters which can in any way affect the work or the cost thereof under this contract. Any failure by the Contractor to acquaint himself with all the available information concerning these conditions will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the negotiation and execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that responsibility therefor is assumed by the Government. Representations made but not so expressly stated *469 and for which, liability is not expressly assumed by the Government in the contract shall be deemed only for the information of the Contractor and the Government will not be liable or responsible therefor.
$ ¥ $ ¥
GC-6. Progress Charts, Sundays, Holidays and Nights. — (a) The Contractor shall within five days or within such time as determined by the Contracting Officer, after date of commencement of work, prepare and submit to the Contracting Officer for approval a practicable and feasible schedule, showing the order in which the Contractor proposes to carry on the work, the date on which he will start the several salient features (including procurement of materials, plant and equipment) and the contemplated dates for completing the same. The schedule shall be in the form of a progress chart of suitable scale to indicate appropriately the percentage of work scheduled for completion at any time. The Contractor shall enter on the chart the actual progress at the end of each week or at such intervals as directed by the Contracting Officer, and shall immediately deliver to the Contracting Officer three copies thereof.
(b) The contractor shall furnish sufficient forces, construction plant and equipment, and shall work such hours, including night shifts, overtime operations and Sunday and holiday work, as may be necessary to insure the prosecution of the work in accordance with the approved progress schedule. If, in the opinion of the Contracting Officer, the Contractor falls behind the progress schedule, the Contractor shall take such steps as may be necessary to improve his progress and the Contracting Officer may require him to increase the number of shifts, and/or overtime operations, days of work and/or the amount of construction plant, all without additional cost to the Government.
(c) Failure of the Contractor to comply with the requirements of the Contracting Officer under this provision shall be grounds for determination by the Contracting Officer that the Contractor is not prosecuting the work with such diligence as will insure completion within the time specified. Upon such determination the Contracting Officer may terminate the Contractor’s right to proceed with the work, or any separable part thereof, in accordance with the Delays-Damages Article of the contract.
*****
SC-7. Physical Bata. — The information and data furnished or referred to below are not intended as repre *470 sentations or warranties but are furnished for information only. It is expressly understood that the Government will not be responsible for the accuracy thereof or for any deduction, interpretation or conclusion drawn therefrom by the contractor.
(a) Subsivrfaoe Investigations. — The location and logs of core holes drilled by the Government to determine the character of materials to be encountered and removed are shown on the drawings (Drawings Nos. G104-3 to C104-13, inch). _ Samples taken from these core holes are available for inspection in U.S. Engineer Field Core Sheds at the site of the work. Location and logs of core borings are indicated on the drawings for the information of bidders.
* * * ❖ $
SECTION II — DIVERSION AND CARE OF WATER DURING CONSTRUCTION
2-01. Unwatering of Work Areas. — All permanent work shall be done in the dry. The contractor shall unwater permanent work areas and shall keep the work free from water until that portion of the permanent work below the water level is completed. (Drawing No. C10A-18.)
* % * # #
SECTION III — EXCAVATION
3-01. General.
(a) Excavation shall consist of the removal, hauling and disposal of any class of material encountered at any location shown on the drawings, specified herein, or designated by the contracting officer. Excavation of materials for use in the construction of the embankment shall be so conducted as to segregate materials of different character in accordance with their suitability, as determined by the contracting officer, for use in the vai'ious parts of the work. The locations and excavation limit lines for the different parts of the work are generally as shown on the drawings. (Drawings Nos. C104-17, C104-18, C104-21 and C104-22.)
(b) The contractor shall furnish and. put in place such sheeting and bracing as may be required to support the sides of all trenches or other excavations, and shall remove such sheeting and bracing as the trench or excavation is filled, unless otherwise directed by the contracting officer. The contractor shall at all times *471 take such precautions as are necessary to keep the work free from ground and surface water.
3-02. Glassification, Definition and Method.
* * * * *
(2) Excavation, Common, shall include all earth, clay, sand, silt, gravel, and also such hard and compact materials as hardpan, cemented gravel, shale, and soft or disintegrated rock that can be removed by hand, power shovels and dragline without continuous and systematic blasting, barring, and wedging, and shall also include all boulders or loose rock less than one cubic yard in volume, and topsoil and vegetation not included in subparagraph 3-02 (b) (1) above. Common excavation as defined above shall consist of all material required to be excavated for the permanent work, except that material specified herein, shown on the drawings, or otherwise required by the contracting officer, to fall within one of the other five classifications tabulated in subparagraph 3-02 (a) above.
£ ❖ ‡ # %
3-06. Measurement and Payment.

(&) Measurement.

(1) A survey of the site of the specified work will be made prior to commencement of work under this contract, and the ground surfaces as determined by this survey will form the basis for measurement of quantities excavated in prosecution of the work. No allowance will be made for overcut and the contracting officer may require the satisfactory replacement of such overcut by and at the expense of the contractor.
Hi # * $ $
SECTION IV — EMBANKMENT
*N H* * H* sfc
4 — 05. Material Glassifications.
(a) General. — Materials for rolled fill shall be secured from the sources designated in paragraph 3-02. The order of excavation and the deposit of -these materials in the rolled fills shall be as directed' by the contracting officer to the end that all suitable material obtained from all required excavation shall, subject to the requirements of subparagraph (b) below, be used in the embankment and m the fill sections of the construction building areas. The origin of any material from either structure or borrow excavation will in no way *472 determine where it may be used in the embankment or fill areas. To secure material of a certain type it may be necessary to excavate in lifts so that different types of material may be kept separate. Materials from two origins will probably be required to be used at the same time and in the same part of the embankment, mixing being done as specified in subparagraph (b) below. No soluble material, brush, roots, sod and perishable or unsuitable material, as determined by the contracting officer, shall be placed in the rolled fill. In no case shall materials be wasted, except by specific instructions from the contracting officer concerning the specific material.
(b) Boiled Fill shall consist of a mixture of overburden and shale, or may consist of unmixed overburden or borrow materials providing such materials meet these specifications and the approval of the contracting officer. * * * Overburden or borrow materials and shale shall be mixed during spreading by use of alternate dumping and withdrawing of the two materials and after spreading and before rolling by the action of a spring-tooth harrow followed by a disc harrow. * * *
4 — 06. Placement of Earth Fill.- — The combined excavation and embankment placing operations shall be such that the materials, when compacted in the embankment, will be blended sufficiently to secure the best practicable degree of compaction, impermeability and stability. The dumping of the successive loads from the different parts of the required excavation areas and. borrow areas shall be at locations on the embankment as directed by the contracting officer. When different materials are being placed in the same area of the embankment, they shall be so dumped as to provide the required portion of the materials through the entire area. After dumping, the materials shall be spread by bulldozer or other approved methods in layers approximately six inches thick and mixed by harrowing and discing, where required, so that a uniformly mixed material results and so that the loads of different materials are merged and their identity is lost. Each layer or lift shall extend to an approximate uniform elevation over the entire width of the cross section of the earth fill and for the entire length of the construction. During the dumping and spreading processes, the contractor shall maintain a force of men sufficient at all times to remove all roots and trash and all stones greater than six inches in maximum diameter from the rolled fill section. Pieces of shale having a maximum dimension greater *473 than six inches shall be broken up prior to rolling or shall be removed and wasted. In the movement of trucks, tractors and other vehicles on the embankment, they shall spread out and not track each other to such an extent as to make ruts. If, in the opinion of the contracting officer, the rolled surface of any layer is too smooth to bond properly with the succeeding layer it shall be roughened or loosened by scarifying to the satisfaction of the contracting officer before the succeeding layer is placed thereon. The top surface of the earth fill during construction shall be kept crowned with grades not to exceed two percent so that the fill will drain freely toward the slopes.
4-07. Moisture Control. — The material in each layer of rolled fill, while being compacted by rolling or tamping equipment, shall contain as nearly as practicable the amount of moisture required to give the desired degree of compaction as determined by the contracting officer, and the moisture content shall be uniform throughout the layer. The watering shall be done with any type of watering equipment which will give the required results, but jets shall not be directed 'at the material with such force as to wash out the finer materials. The amount of sprinkling shall be controlled so that no free water will appear on the surface during or subsequent to the rolling. In general, the water shall be added to the surface of the last rolled or tamped layer rather than to the material to be spread. Should too much water be added to any part of the fill so that the material is, in the opinion of the contracting officer, too wet to permit the securing of the desired compaction, all work on that section of the fill shall be delayed until the material has dried to the required moisture content. If the material, as dumped, is too high in water content to secure the desired compaction it shall be spread in six-inch layers and left for a sufficient time to allow the surplus water to dry out. If the surface of the last rolled or tamped layer should harden from drying to a point below its proper water content it shall be loosened by scarifying or discing to a depth sufficient to reach through the dried material, dampened to its proper water content and sufficient new material added to bring the layer of loose material to a thickness of approximately six inches and then compacted. The practice of reducing excessive amounts of water content by the addition of dried materials will be allowed only by permission of the contracting officer and permission must be obtained for each specific case.
*474 4r-08. Compaction.
(a) Boiler Units. — The earth fill shall be compacted with roller units consisting of three sheep’s-foot tamper-type rollers, two abreast with the third one behind to cover the strip left between the two with sufficient overlap. The two rollers traveling abreast shall be so mounted as to permit oscillation. Each roller shall have tamping feet uniformly staggered over its cylindrical surface and shall be equipped with cleaners. Each tamping foot shall project approximately seven inches from the roller’s cylindrical surface and shall have a face area of not less than five nor more than seven square inches. The spacing shall be such as to provide approximately three tamping feet for each two square feet of cylindrical surface. The rollers shall be of a type which can be weighted by liquid or sand ballast as required to secure the densities required. The total weight of the roller in pounds divided by the total area of the maximum number of tamping feet in one row parallel to the axis of the roller shall be not less than 250 pounds per square inch of tamping-foot area, with the drum empty, and not less than 450 pounds per square inch of tamping-foot area with the drum ballasted. The design, weight and operation of the tamping rollers shall be subject to the approval of the contracting officer, and he shall have the right at any time during the prosecution of the work to direct such repairs to tamper feet, change in loading and minor alterations in the roller as may be found necessary to secure required compaction of the earth-fill material.
^ *!• *í* 'I*
4-09. Density Control.
(a) Samples. — Samples of all rolled and tamped earth-fill materials for testing, both before and after placement and compaction, will be taken by the contracting officer at frequent intervals, and corrections, adjustments, and modifications of methods, materials and moisture content as indicated desirable by these tests shall be made by the contractor, as directed by the contracting officer, in order to secure the specified density of the materials used.
* * * ¡s *
The plans, specifications, and drawings are in evidence and were made available to all bidders.
12. In 1989 subsurface explorations at the Hulah Dam site were performed by means of core borings, auger borings, *475 test pits, and undisturbed sample borings. The primary-purpose for these subsurface investigations was to test the strength of the foundation materials for the dam and determine their suitability for the embankment construction. The original logs noted the presence of water or an actual water table in many of these borings. Since no substantial amounts of pervious materials were revealed by the explorations, a provision was made in the design for an embankment consisting primarily of impervious materials to be obtained from Borrow Area I and from excavation in the spillway and diversion channel areas. With the exception of core hole No. 12, which was located at the intersection of the left bank of the Caney Biver and the axis of the dam (through which point the southeast periphery of the diversion channel was cut), no subsurface explorations were ever performed within the limits of the work area of the diversion channel.
13. Mr. L. M. Bush, a consulting engineer, prepared the plaintiff’s bid estimate for the work covered by the contract. He made preliminary investigations on the job site on three occasions in March 1946, the last of these occasions with plaintiff Leal. On these occasions, he took a set of the plans and drawings and specifications with him, examined the cores which were kept in the coring shed, looked over the general requirements, observed the river banks, studied the field conditions, and analyzed the plans and layout. Plaintiff Leal and Mr. Bush checked for possible ground water by walking the banks of the Caney Biver for about three-quarters of a mile in each direction from the axis of the dam. They found no seepage of water into the river from the river banks, and concluded that excavation in the diversion channel would be an entirely dry operation.
14. Mr. Bush went to the resident engineer’s office on the second trip to the job site, but found he was not in. Neither Bush nor Leal made any further attempt to contact the resident engineer prior to the preparation of plaintiff’s bid. During the period between February 21, 1946, and March 21, 1946, ten prospective bidders contacted the resident engineer, George A. McClaskey, and he personally escorted them around the job site. He pointed out the various phases *476 of the job, including work on the embankment and the diversion channel. Several prospective bidders raised the question of ground water, indicating that they had expected to encounter ground water and wet material in the diversion channel, but no one knew at what depth it might be found.
15. On March 22, 1946, plaintiff’s brother, Sam Leal, representing plaintiff at the pre-award conference, advised that plaintiff intended to supply water for the Government buildings by digging a well. By letter dated April 24, 1946, plaintiff submitted for defendant’s approval drawings and specifications for drilling a well forty feet deep from elevation 805 to 765. This well was planned about 750 yards from the diversion channel.
16. The water table does not represent the maximum elevation at which wet material might be expected. Immediately above the water table there is a narrow zone of the fine-grain material, which usually ranges from about one to ten feet in thickness, which is kept constantly wet by capillary attraction. This zone is called the capillary fringe. The height of the capillary fringe depends upon the molecular forces of the soil particles. For example, coarse material, like gravel and sand, has a smaller capillary fringe than finer soil, like silt and sandy soil. The log record of explorations in adjacent areas revealed the existence of a fine-grained material, indicating that a capillary fringe up to five feet could be expected above the water table in the area of excavation for the diversion channel.
Prior to making his bid, plaintiff Leal and his estimator examined the core borings on the job site and determined that the required excavation in the diversion channel would be a silty type of soil, but did not consider its capillary characteristics for absorption of underground water.
17. Prior to bidding, plaintiff Leal was furnished with the plans for construction of embankment and excavation for spillway for Hulah Dam, which included drawings of foundation explorations, borings made, and materials recovered. Drawing C104-4 is a profile of 85 borings and test pits made across the Caney Eiver valley along the axis of the dam. The downstream end of the diversion channel intersects the left bank of the Caney Eiver at the axis of the dam. Hole *477 number 12 contained a line drawn on its left side at tbe approximate elevation of 689, and tlie letters “WT” were written above this line. Ten of the other 84 borings along the axis of the dam were labeled in a like manner. Although the legend at the bottom of the sheet did not contain an interpretation of the letters “WT,” such letters were placed on the sheet to indicate the existence of a water table.
18. Plaintiff, using an elevating grader and self-loading scoops, excavated in the diversion channel until his equipment became bogged down, approximately at elevation 702. Plaintiff then used a dragline and excavated down to grade at elevation 690 at the extreme upstream end of the diversion channel on August 24, 1946. The bottom eight feet of the twelve-foot cut, elevation 690 to 698, was found to contain saturated material. The upper four feet, elevation 698 to 702, was found to contain material of approximately the same moisture content as that previously excavated.
19. By letter dated September 5, 1946, plaintiff, through his project manager, J. B. Howard, advised the contracting officer, Col. C. H. Chorpening, that persistent subsurface water had been encountered at elevation 698, and that the resident engineer had instructed that the wet material be excavated to elevation 690, and compacted on the embankment, causing increased costs and delay. Plaintiff requested that the elevation of the diversion channel be raised above the level of the water or that this wet material be wasted and proceed with the embankment fill from the other areas provided. Plaintiff requested reimbursement for increased costs and an extension of time in the event it was found necessary to continue the operation as instructed by the resident engineer.
20. By letter dated September 11, 1946, Colonel Chorpen-ing denied plaintiff’s request for reimbursement of costs and an extension of time, and instructed that he continue with the excavation of the diversion channel and the compaction of the embankment in accordance with the specifications. It was pointed out that the water table on hole 12, located in the downstream end of the diversion channel was at approximate elevation 690 and that the water table could logically be assumed to be higher at some distances away *478 from the river bank. Colonel Chorpening advised that an investigation had been conducted with respect to the use of this wet material on the embankment, and, in the light of the then current production, he was unable to see how operations would have to be shut down due to its use. By letter dated September 17, 1946, plaintiff advised Colonel Chorpening that an exception would be taken to his decision.
21. On October 7, 1946, plaintiff appealed the decision of the contracting officer to the Secretary of War. This appeal was not submitted immediately to Washington, but was retained at the office of the District Engineer, Tulsa, Oklahoma, at the request of the plaintiff, who asked that his appeal remain there until further notice. This appeal claimed excess costs of $87,500 and sixty days’ extension of time for completion of the contract.
' Plaintiff stated that he did not know the meaning of the notation “WT” with respect to hole 12 on drawing C104-4 of the plans since it was not explained or labeled on the drawing and the ground water table was not otherwise indicated or disclosed.
22. Findings of Fact of the contracting officer, dated October 22, 1946, which accompanied the plaintiff’s appeal, reported that the letters “WT” indicated the existence of a water table found by the cored holes and appeared on the drawings in accordance with customary practice. The contracting officer also determined that the wet material did not constitute a changed condition since the materials encountered did not differ materially from anything shown on the drawings, and that the wet material could reasonably have been expected in the excavation for the diversion channel to the approximate depth of the river channel.
Early in 1947, plaintiff requested that his claim be presented to the Corps of Engineers Claims and Appeals Board in Washington, D.C.
23. On May 9, 1947, plaintiff submitted a response to the Findings of Fact mentioned above which stated in part: “It is a sound conclusion that had the water encountered in the borings adjacent to the diversion channel been shown on the log record and symbolized as water on the log record *479 drawings that the bid price of excavation would have reflected the cost of wet excavation * *
24. On May 15 and 16,1947, plaintiff, represented by legal counsel, engineering representative O. M. Confer, and project engineer H. L. Bailey, appeared before the Corps of Engineers Claims and Appeals Board, Washington, D.C., which represented the Secretary of War, and presented their claim. This claim advanced the following principal contentions:
A. The letters “WT” on drawing C104-4 were not explained, and their meaning was unknown to the plaintiff. The existence of ground water in the diversion channel at elevations between 690 and 698 constituted a changed condition for which an equitable adjustment was claimed, in addition to an extension of time of thirty days.
B. The contracting officer erred in classifying wet excavation as suitable fill material instead of permitting it to be wasted, and that the requirement for its processing before compaction in the embankment constituted additional work for which an equitable adjustment was claimed, including an extension of time of thirty days.
25. On July 22, 1947, the Corps of Engineers Claims and Appeals Board reported its findings in substance as follows:
A. The specifications reveal the elevation on the diversion channel at 690 plus or minus, to be determined in the field by the contracting officer; the upstream end of the channel was fixed at 690 and the downstream end was fixed at 688 to correspond with the Caney Biver channel which did not constitute a changed condition within the intent of the specifications and drawings.
The use of the letters “WT” on drawing CIOLA, indicating the water table at approximate elevation 690 at the downstream end of the channel, found in hole 12, was not so ambiguous as to be without significance as to the existence of water at the stated elevation. On the contrary, the specifications clearly contemplated the existence of ground water in the course of the work. Paragraph 2-01 of the specifications required that “all permanent work shall be done in the dry,” and that “the contractor shall keep the work free from water until that portion of the permanent work below the water level is completed.” Paragraph 3-01 (b) dealing with *480 “Excavation” provided that “The contractor shall at all times take such precautions as are necessary to keep work free from ground and surface water.” On the basis of available data, it was considered by the Board that the appellant might reasonably have determined that the water table would rise generally at points away from the river “to levels above the water level of the river edge elevation of 690.” In this connection, contract drawing C104-4 indicated the water table for core holes numbers 12,16, and 18 at points progressively shoreward in the order designated, and the level is shown higher for each succeeding core hole. The Board also stated that since core hole number 12 was located “in the edge of the river bed, it appears natural that the water table away from the river bed would be at a higher elevation.” It was concluded by the Board that this did not constitute a changed condition and the appeal on this portion of plaintiff’s claim was denied.
B. Regarding the use of wet materials on the embankment, the Board of Appeals cited paragraph 4-05 of the specifications which provided that all suitable materials obtained from all required excavation should be used in the embankment and that in no case would materials be wasted, except by specific instructions from the contracting officer. The Board felt that, while this provision, of itself, would not justify the use of material obviously unsuitable for fill, it nevertheless would warrant classification as fill of otherwise suitable material which might be excavated with a water content above the optimum for compaction purposes, particularly in view of paragraph 4-07 of the specifications, which required that if material, as dumped, was too high in water content to be compacted it should be spread in six-inch layers, allowing the surplus water to dry out before compaction.
The Appeals Board reported, and the contracting officer found, that there had been no delay in construction of the embankment due to the use of wet material from the diversion channel, other than the time required for the surplus water to dry out, and that the appellant presented no evidence or testimony to refute this finding, nor was evidence presented which would indicate that the appellant performed *481 any work in addition to that required by the contract specifications. The Board concluded that this item of the appeal should also be denied.
26. Plaintiff has now conceded in his requested findings that the symbol “WT” means “water table,” although no explanation of these letters is made on the plans and drawings.
Plaintiff contends that the defendant withheld information as to a water table on many of the borings, and that these holes, for the most part, were bored in 1939 during one of the dryest periods in Oklahoma’s history when there was no flow in the Caney Elver, whereas the drawings and plans furnished the bidders do not show the dates of the borings and such drawings and plans are dated November 27,1945.
27. Defendant’s original logs of approximately 200 borings in the Caney Kiver valley, which, for the most part, were completed in 1939, contained 48 holes where a water table was shown, but this information was not shown on the drawings or plans furnished the plaintiff. None of these holes was in the diversion channel area. Drawing C104-4, showing a profile of the axis of the dam with “WT” on eleven holes out of 35, could actually have shown a “WT” on 26 out of the 35 holes, had the water table data been transferred from the original log records to the papers and documents furnished bidders.
28. Defendant had in its possession a printed booklet entitled “Analysis of Design for Construction of Embankment and Excavation for Spillway” for the Hulah Dam and Eeservoir, which was not sent to the bidders on the contract now in suit. This booklet contained information revealing that a water table existed across the entire alluvial valley, and that its depth below the ground level yaried from a minimum, of about ten feet adjacent to the base of each abutment to a maximum of about 35 feet in the vicinity of the river, and that this water table was affected to only a slight degree by seasonal moisture variations. Additionally, this booklet revealed that the dam foundation soils were characterized by a high degree of capillarity, and, because of this condition, even the soils above the water table were ordinarily near saturation.
*482 A test embankment had been constructed by the Corps of Engineers on the site, and, even though more fine-grained materials were used than the average of those soils in the borrow areas, compaction was readily attained at water contents equivalent to or slightly below optimum. Difficulty was experienced in compacting soils at a water content greater than about 23 percent, and some difficulty was experienced when roller pressures in excess of about 400 per square inch were used.
29. Since the Hulah Dam was built in an alluvial valley on a permanent river in northeastern Oklahoma, the geological structure is such, that a water table could be expected at the water level of the river near its edge, rising in the ground areas as the distance away from the river increased. The indication of the water table on eleven of the 35 holes across the axis of the dam shows the general location of the water table across the valley.
30. Plaintiff claims that he considered that cored hole 12 showed a water table at elevation 688, but that holes from 1,600 to 1,800 feet on either side failed to show any water table, and those up and down stream failed to show a water table, and he assumed they were dry. He concluded that the river valley, including the diversion channel area, would be dry. He concluded that the eleven holes marked “WT” would indicate only pockets of water that would not extend across the entire valley. Plaintiff also contends that, had the notation “WT” been placed on all the holes where a water table was encountered, he would have concluded that a water table existed across the entire valley.
Plaintiff and his estimator apparently failed to consider the geological structure in respect to the location of the dam site before- submitting their bid, or they would have expected to encounter a water table at about the surface of the river, rising slowly at distances away from the river.
31. There was sufficient information in the drawings and specifications to indicate to an experienced operator the existence of a water table in this valley. Plaintiff was required by the specifications to investigate the job site and satisfy himself as to the nature and location of the work, including the condition of the ground, the character, quality, *483 and quantity of surface and subsurface materials to be encountered. A failure to acquaint himself with all available information concerning these conditions would not relieve him of the contractual responsibility of estimating the difficulty or cost of successfully performing the work. He was not furnished all available information.
If the plaintiff was unaware of the meaning of the notation “WT” at the time of bidding, he could have made inquiry as to its meaning, as provided in paragraph 5 of the Invitation for Bids. If defendant had furnished to bidders all of the information relating to subsurface water conditions previously discovered in the course of its investigation, plaintiff Leal would have been better informed as to the type of excavation which might be expected in the alluvial valley.
32. Plaintiff contends, as he did before the Corps of Engineers Claims and Appeals Board in 1947, that the handling of these saturated materials on the fill caused delay, that operations had to be shut down to allow these materials to dry on the embankment and that this caused an interference with the plaintiff’s contemplated sequence of operations, resulting in increased costs, for which he was not compensated. The record shows that a waiting period of from three to five days was required for the wet material to dry before it could be compacted on the fill.
33. Plaintiff expedited work in the diversion channel until August 24, 1946, when he encountered saturated material. It was plaintiff’s original intention to complete Item 2 of the contract, which dealt with the diversion and care of the water, by November 1,1946.
From August 24, 1946, to about November 1946 plaintiff was negotiating with the defendant in an attempt to either waste the wet material and use materials from the borrow areas in the embankment, raise the grade of the diversion channel above the wet material to elevation 698, or obtain additional compensation for this wet excavation and compaction as a changed condition under the contract. During this period plaintiff discontinued the expeditious excavation in the diversion channel and concentrated his efforts on the work in the spillway area and borrow pit.
*484 34. Tlie Kesident Engineer advised the plaintiff, by letter dated October 17, 1946, that operations in the diversion channel had not been diligently prosecuted since August 24, 1946, and requested that the plaintiff plan and coordinate operations for continuous excavation and placement of materials from all areas.
Had plaintiff continued regular operations in the diversion channel, he could have excavated from 1,200 to 1,500 cubic yards per day from the diversion channel in two shifts after August 24,1946.
35. The following chart reflects plaintiff’s progress in excavation common (item 4 of the contract) during the period of performance in the diversion channel:

This excavation came from the diversion channel and the spillway, but was not broken down as to origin in the progress reports. The above yardage also includes the amount contributed by plaintiff’s subcontractor who was excavating in the spillway for a part of this period (dates not shown in the record).
Plaintiff worked two shifts when possible except during November 1946, and subsequent to December 27, 1946.
The Caney Biver was diverted through the diversion channel on February 4, 1947, and thereafter only negligible amounts of material were obtained from this source.
36.From August 24, 1946, when wet material was discovered in the diversion channel, until November 1, 1946, plaintiff averaged about 6,500 cubic yards of common excavation per work day, of which a maximum of about 1,500 cubic yards could have come from the diversion channel. During this period, the embankment was about 2,500 feet long and averaged about 325 feet wide. Approximately 15,046 cubic *485 yards of materials could have been placed on tbe embankment at the specified depth of six inches. If it required the maximum drying period of five days before beginning compaction of wet material, the maximum excavation of 1,500 yards a day would have covered only one-half of the embankment area, allowing additional production and compaction of about 7,500 cubic yards per day from other sources.
In periods subsequent to November 1, 1946, plaintiff’s average daily production of excavation common was not sufficient to cause a problem on the embankment.
37. Although plaintiff contends that operations were shut down a day or two in early September 1946 because of his inability to place the wet material from the diversion channel, the daily progress reports and the Resident Engineer’s daily log reveal that shutdowns were caused, for the most part, by rain, lack of hauling units, and repairs. There is no information in the progress reports or engineer’s log which shows that the dragline or compaction operations on the embankment were shut down because of plaintiff’s inability to use wet material from the diversion channel. Plaintiff did not add any additional equipment to the project because of compaction difficulties and aeration.
The record does not establish that any substantial delay in the embankment construction was caused by the use of wet material from the diversion channel.
38. The use of the wet material interfered with plaintiff’s originally planned sequence of operations in that it was necessary to more closely correlate hauling units for wet and dry materials; to keep the material separated on the embankment; to haul dry material when the embankment was getting too wet; and to haul wet material whenever possible. It became necessary to place several layers of dry materials over a wet area, before placing another wet layer, for better compaction. Additionally, it became necessary to compact the embankment in sections or quarter strips instead of compacting the entire 2,500 foot length of embankment.
The use of wet material, otherwise suitable for embankment construction, was required by the contracting officer in accordance with the specifications.

*486
DAMAGES

39. Tbe original petition, claimed a total sum of $105,875, The plaintiff now claims increased costs for the excavation of wet material from the diversion channel and its use in the embankment construction as follows:
(1) For excavation of approximately 85,500 cubic yards in the diversion channel between elevations 690 and 702 at $2.21 per cubic yard (estimated cost of $2.50 per cubic yard less 29 cents paid under the contract_$188,955
(2) For the re-excavation of approximately two feet of shale from the spillway which had been placed across the entire diversion channel at approximate elevation 702 to support the operating equipment, representing an estimated 17,600 cubic yards at an estimated cost of $2.50 per cubic yard_ 44,000
(3) For handling and compacting the above materials on the embankment, approximately 103,100 cubic yards at $1.12 per cubic yard (estimated cost of $1.22 less 10 cents paid under the contract)_$115, 472
Total amount claimed_ 348,427[1]
The plaintiff produced no records of its actual cost in the performance of the contract involved herein. Bank statements, cancelled checks, and invoices were examined by plaintiff’s accountant in the spring of 1948 at Ardmore, Oklahoma, for the preparation of plaintiff’s tax return for 1947, but are no longer available. The overall costs and income for tax purposes were not determined or allocated to the various jobs performed, during the years 1946 and 1947.
The plaintiff’s claim is based upon his own estimates and the testimony of his project engineer, Herbert L. Bailey, his consultant engineer, L. M. Bush, who estimated plaintiff’s bid, and Aubrey E. Harlow, a former employee on this contract.[2]
*487 40. In a letter dated September 5,1946, to the contracting officer, with respect to the wet materials encountered at elevation 698 on August 24,1946, the plaintiff stated, “Costs are being kept on the wet excavation and the placement and processing of the super-saturated material * *
In plaintiff’s appeal to the Secretary of War he requested additional payments of $87,500 for the excavation of material between elevation 698 and 690 in the diversion channel, estimated to be 70,000 cubic yards, at an increased cost of $1 a yard for excavation, plus 25 cents a yard for the processing and compaction of the same on the embankment.
Although no prior claim was made for the removal of shale placed in the diversion channel to support the equipment, the plaintiff’s project engineer’s testimony before the Board was that twelve inches of this shale had been placed, which required removal.
41. Wet excavation in the diversion channel was encountered at approximate elevation 698. The plaintiff excavated approximately 55,360 cubic yards of wet excavation below elevation 698, all of which was found suitable for embankment construction by the contracting officer, and plaintiff was required to use it for that purpose. The plaintiff was paid the contract price of 29 cents a cubic yard for all common excavation and 10 cents per yard for embankment construction.
No payment was provided in the contract, nor was any allowance made to the plaintiff, for the placing of shale in areas of the diversion channel. No prior claim was made for the removal of the shale. The employment of shale to support equipment constituted a common method of operation, and part of the cost of the excavation in the lower level of the channel.
42. There is no satisfactory evidence of record, in the form of books and records kept by plaintiff, for a determination *488 of the cost of excavation, of wet material from the diversion channel nor the extra cost, if any, which was incurred during a drying period before compaction could be effected on the embankment. It is Leal’s claim that the records relating to the performance of the contract were stored in a warehouse at Ardmore, Oklahoma, with Leal’s office equipment. The office equipment was subsequently sold for storage charges. No records concerning the actual cost of excavating and handling the wet material are now available.
The plaintiff’s income tax return for 1947 reported an operating loss of $36,822.31. Plaintiff’s returns were reported upon a cash receipts and disbursements basis, and, by the end of 1947, plaintiff’s unpaid indebtedness had accumulated to $127,789. Such indebtedness is not subject to a determination as to its origin, whether it was attributed to the contract in suit or other projects, nor is the period of accumulation shown.
43. Plaintiff’s method of operation in the diversion channel after encountering wet material was conducted in such a manner as to make working conditions more difficult, reduce normal production, and increase the cost of the work.
The plaintiff employed an elevating grader and self-loading scoops in excavating the diversion channel down to approximate elevation 702, where the ground would no longer support this type of equipment. Thereafter, the plaintiff employed a 2% cubic yard dragline, of approximately 50 tons, to make the final cut of about twelve feet.
Plaintiff commenced excavation with the dragline at the upstream end of the diversion channel, adjacent to the Caney River, where the cut was made down to the required grade or bottom of the channel. A seepage occurred as soon as the cut was made, causing a ponding of the water in the work area. Sometimes the accumulation of water was as much as 3y2 feet above final grade, and the material cut under water was mixed with the comparatively dry material at the top portion of the cut.
The defendant suggested to plaintiff on a number of occasions, both orally and in writing, the advantage of excavating from the downstream end of the channel to allow the free water to flow downstream out of the work area. *489 Plaintiff continued excavation in the upstream end of the diversion channel for approximately one-third of its length because of a shorter haul route.
The plaintiff was requested, both orally and in writing, to pump the water from the work area in the diversion channel, as required by the specifications, but plaintiff had no pump on the job until September 16,1946, and little effective pumping was done for some time thereafter because of the poor condition of the pump and frequent breakdowns.
Ultimately the plaintiff cut a drainage pilot channel from the lower end of the diversion channel and performed the remaining two-thirds of the excavation to grade by working from the downstream end of the channel, and much water was eliminated from the work area by natural drainage.
Laboratory tests of materials from the diversion channel showed that the upstream one-third of the diversion channel contained materials with an average water content of 24.3 percent, whereas the downstream portion had an average water content of 21.6 percent.
It is reasonable to conclude that the method of operation and failure to provide dewatering equipment at an earlier date increased plaintiff’s costs an indeterminate amount.
44. By instrument of assignment, given and acknowledged on the 26th day of April 1946, plaintiff Alvin H. Leal duly assigned to plaintiff Mercantile National Bank at Dallas all monies and amounts then and thereafter payable to said Leal under the contract now in suit. The assignment reads in pertinent part:
This assignment shall be deemed to be absolute and the Borrower does hereby irrevocably authorize and empower the Bank to demand, receive and receipt for all sums of money to which this assignment relates; to commence, maintain, or discontinue any action, suit or other proceeding which it deems advisable to collect or enforce payment of the amount assigned; to compromise, compound, and settle the same; * * *.
The Borrower agrees that if any payment should be made to the Borrower for application on any indebtedness or liability affected by this assignment, the Borrower will forthwith deliver to the Bank any cash so received, and will forthwith endorse, transmit, and deliver to the Bank any and all checks, drafts, warrants, *490 or other forms of remittance so received, in such manner and form that they may be collected by the Bank; and the Borrower agrees not to commingle any such cash or other remittance with any of the funds or property of the Borrower, but to hold the same separate and apart, in trust for the Bank, until delivery or payment thereof is made to the Bank.
* * # ❖ *
Parties accepting assignment of the above described contract or contracts, hereby assigned, are hereby authorized and directed to make all payments becoming due under said contract or contracts, direct to the Bank.
Plaintiff Mercantile National Bank at Dallas duly filed notice of such asignment with the contracting officer, the disbursing officer, the General Accounting Office, and the contractor’s sureties, and receipt of such notice was duly acknowledged by all parties notified.
All contract payments made by defendant were paid to said bank as assignee.
45. The plaintiffs in this suit entered into the following agreement on May 25,1956:
AGREEMENT
THIS AGREEMENT entered into this 25th day of May, 1956 by and between MERCANTILE NATIONAL BANK at Dallas, Texas, a corporation, hereinafter referred to as FIRST PARTY, and ALVIN H. LEAL of Ardmore, Oklahoma, an individual, hereinafter referred to as SECOND PARTY, WIT-NESSETH:
1. WHEREAS, SECOND PARTY trading as PLAINS CONSTRUCTION COMPANY, having on or about April 17, 1946 entered into a contract numbered W-34-066-eng-477. with the UNITED STATES OF AMERICA for the Construction of Embankment and Excavation of Spillway for Hulah Dam; Caney River, Osage County,’ Oklahoma, did thereafter assign to FIRST PARTY all monies then due or to become due SECOND PARTY under said contract, as collateral security, for the payment of loans and all indebtedness which SECOND PARTY then owed or might thereafter owe to FIRST PARTY; and
2. WHEREAS, SECOND PARTY completed performance of the said contract with the UNITED STATES and in so doing incurred substantial financial *491 losses for the recovery of which SECOND PAETY has asserted claims against the UNITED STATES which are now pending and awaiting trial in the United States Court of Claims as Case No. 199-53; and
3. WHEEEAS, by virtue of the above mentioned assignment executed by SECOND PAETY, any and all sums of money which might be paid by the UNITED STATES on account of the above mentioned claims would be payable to FIEST PAETY alone as the as-signee of SECOND PAETY; and
4. WHEEEAS, FIEST PAETY has the right to maintain and prosecute the above mentioned action against the UNITED STATES but is unwilling to incur any expense incident to the preparation for trial and prosecution of that action and SECOND PAETY is _ willing _ to make the necessary preparation for the trial of said action and to prosecute the same to a conclusion in the United States Court of Claims at his own cost and expense, provided that FIEST PAETY, after retaining for itself the amount hereinafter agreed upon, shall release and pay over to SECOND PAETY’S attorney, ME. EENEST HUBBELL, of Kansas City, Missouri, or his assignee, an amount equivalent to thirty-three and one-third per cent (33%%) of the gross amount which may be paid by the UNITED STATES to FIEST PAETY as assignee of SECOND PAETY, together with such additional amount for expenses incurred by said attorney as shall be approved in writing by SECOND PAETY and provided further that FIEST PAETY shall pay to SECOND PAETY such portion of said gross amount remaining after the above mentioned items are deducted.
5. WHEEEAS, SECOND PAETY has heretofore employed ME. EENEST HUBBELL, a duly licensed attorney of Kansas City, Missouri to prosecute the above mentioned claims of SECOND PAETY against the UNITED STATES and has agreed to pay said EENEST HUBBELL a contingent fee of one-third (%) of all sums receovered by suit, settlement or otherwise from the UNITED STATES and SECOND PAETY has further agreed to pay said attorney’s expenses incurred in connection with the prosecution of said claims;
6. WHEEEAS, FIEST PAETY has offered to pay over to SECOND PAETY that part of the gross amount of money which may be paid by the UNITED STATES to FIEST PAETY as assignee of SECOND PAETY on account of the above mentioned claims, as *492 shall exceed thirteen and one-third per cent (13%%) of such gross payment, provided that SECOND PARTY shall, at his own cost and expense, cause said claims to be prepared for trial and to be prosecuted in the United States Court of Claims or shall succeed in negotiating a settlement of said claims prior to judgment, or thereafter.
7. NOW, THEREFORE, in consideration of the sum of ONE DOLLAR ($1) paid to FIRST PARTY by SECOND PARTY, and in further consideration of the premises and the mutual undertakings, covenants and agreements herein contained, the parties hereto agree as follows:
8. All prior agreements made between the parties hereto with respect to the payment by FIRST PARTY to SECOND PARTY of any portion of any payment which might be made to FIRST PARTY by the UNITED STATES on account of the claims asserted against the UNITED STATES by SECOND PARTY as above mentioned, are hereby modified as hereinafter provided for.
9. Upon condition that the SECOND PARTY shall at his own expense undertake to prepare for the trial of his said claims and to prosecute the same in the suit now pending against the UNITED STATES as Case No. 199-53 m the United States Court of Claims and shall succeed in obtaining a judgment against the UNITED STATES or shall succeed in effecting a settlement of his said claims with the UNITED STATES, FIRST PARTY as assignee of SECOND PARTY, upon receiving payment of any amount recovered from the UNITED STATES by judgment of the Court or otherwise, shall retain thirteen and one-third per cent (13%%) of the gross amount thereof and shall pay to MR. ERNEST HUBBELL of Kansas City, Missouri, or his assignee, as attorney for SECOND PARTY, an amount equivalent to thirty-three and one-third per cent (33%%) of the gross amount recovered as above mentioned. And in addition thereto FIRST PARTY shall pay to said attorney, ERNEST HUBBELL, or his assignee, such amount for expenses incurred in prosecuting the above mentioned claims as shall be approved in writing by SECOND PARTY. The balance of said gross amount which shall then remain in the hands of FIRST PARTY after the above mentioned payments shall be paid to SECOND PARTY._ The payments above mentioned shall be made within ten *493 (10) days after receipt by FIRST PARTY from the UNITED STATES of the gross amount above referred to.
10. Nothing herein contained shall obligate FIRST PARTY to pay any expense or costs incident to the prosecution of the claims of SECOND PARTY against the UNITED STATES.
WITNESS our hands and seals the day and year first above written.
Attest:
[Illegible signature]_
_Cashier
Witness :
[s] J. B. Williams_
MERCANTILE NATIONAL BANK at Dallas By [s] Jas. H. Rankin_

Vice President

(Title)
FIRST PARTY
[s] Alvin H. Leal
ALVIN H. LEAL, SECOND PARTY
46. Should it be found that plaintiff is entitled to damages for increased costs for wet excavation, and for compaction of such excavated material on the embankment, as urged when the claim was submitted to the Corps of Engineers Claims and Appeals Board, the following computation, which includes re-excavation of shale, is submitted:[3]
For excavation of all material below elevation 698, 55,360 cubic yards @ $1 per yard_$55,360.00
For compaction of the 55,360 cubic yards of wet material, an additional cost of 25 cents per cubit yard_ 13,840.00
Total_ 69,200.00
For re-excavation of 12 inches of shale placed on the diversion channel at elevation 702 (shale was not placed on 300 feet of the diversion channel), 8,518.52 cubic yards @ 29 cents per yard_ 2,470.37
Total including shale_ 71,670. 37
*494 CONCLUSION OF LAW
Upon, the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition therefore is dismissed.

 In respect to this, plaintiff says that he did not know the meaning of the notation “WT” on the drawings. However, plaintiff’s bid was prepared by a consulting engineer, and it seems incredible that neither a contractor nor an engineer would know the meaning of “WT” in the context in which it was used. In any event, a simple inquiry would have revealed the meaning of the notation. Furthermore, plaintiff says he concluded that the 11 holes marked “WT” indicated only pockets of water and not a water table that would extend across the entire valley. This conclusion is inconsistent with his claim that at the time of bidding he did not know the meaning of “WT”.

 TRe Second Amended Petition claimed $338,655. The difference appears to be traceable to computation errors.

 Plaintiff Leal’s original claim, of $1 for excavation and 25 cents for compaction in 1947, based on claimed increased costs, was prepared when his books and records were available. This claimed cost was raised to $3 for excavation and $1 for compaction during trial of the case. Plaintiff’s project engineer, Mr. Bailey, the only one of the four estimators who appeared before the Appeals Board in 1947, testified to three different figures for wet excava *487 tion in 1947. His lowest estimated cost was between $1.25 and $1.50 per cubic yard. In tbe current suit be testified to a definite sum of $1.50 per cubic yard for excavation and $1.50 per yard for compaction. Plaintiff’s consultant engineer, Mr. Busb, testified to $3 for excavation and $1 for compaction ; however, an analysis of tbe costs be furnished supports only a figure of 93 cents per yard, and this figure is based on rented equipment (which is not a proper basis in this case, for the most part) and on wage rates higher than were actually paid:

 The earlier basis for claimed increased costs is used in these computations, although at the trial in this court a much larger amount has been claimed, the petition amended, and evidence offered in an effort to show that plaintiff is entitled to a larger amount than the $105,875 claimed in the original petition. After revision during the trial and subsequently, plus correction of errors in mathematical calculations, the total amount now claimed is $348,427.